**LeClairRyan**
*A Professional Corporation*
One Riverfront Plaza
1037 Raymond Boulevard, 16th Floor
Newark, New Jersey 07102
(973) 491-3600
Attorneys for Plaintiff, Super 8 Worldwide, Inc., formerly known as Super 8 Motels, Inc.

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| SUPER 8 WORLDWIDE, INC., formerly known as SUPER 8 MOTELS, INC., a South Dakota Corporation,<br><br>    Plaintiff,<br><br>v.<br><br>SOHAM INVESTMENTS LLC, an Arizona limited liability company; PRAVIN C. KOTHARI, an individual; and HITESH CHOKSHI, an individual,<br><br>    Defendants. | Civil Action No. 15-<br><br>**COMPLAINT** |

Plaintiff Super 8 Worldwide, Inc., formerly known as Super 8 Motels, Inc., by its attorneys, LeClairRyan, complaining of defendants Soham Investments LLC, Pravin C. Kothari and Hitesh Chokshi, says:

### PARTIES, JURISDICTION AND VENUE

1.    Plaintiff Super 8 Worldwide, Inc., formerly known as Super 8 Motels, Inc. ("SWI"), is a corporation organized and existing under the laws of the State of South Dakota, with its principal place of business in Parsippany, New Jersey.

SWI 3118
16893409v1
23839.1464

2.      Defendant Soham Investments LLC" ("Soham Investments"), on information and belief, is a limited liability company organized and existing under the laws of the State of Arizona, with its principal place of business at 1722 Mitchell Avenue, #105, Tustin, California 92780.

3.      Defendant Pravin C. Kothari ("Kothari"), on information and belief, is a member of Soham Investments and a citizen of the State of California, residing at 1722 Mitchell Avenue, #105, Tustin, California 92780.

4.      Defendant Hitesh Chokshi ("Chokshi"), on information and belief, is a member of Soham Investments and a citizen of the State of Michigan, residing at 11129 Scotscraig Court, Las Vegas, Nevada 89141.

5.      Upon information and belief, Kothari and Chokshi are the only constituent members of Soham Investments.

6.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 inasmuch as the plaintiff and all the defendants are citizens of different states and the amount in controversy in this matter, exclusive of interest and costs, exceeds the sum of $75,000.

7.      This Court has personal jurisdiction over Soham Investments by virtue of, among other things, section 17.6.3 of the June 16, 2005 franchise agreement by and between SWI and Soham Investments (the "Franchise Agreement"), described in more detail below, pursuant to which Soham Investments has consented "to the non-exclusive personal jurisdiction of and venue in the New Jersey state courts situated in Morris County, New Jersey and the United States District Court for the District of New Jersey . . . ."

8.     This Court has personal jurisdiction over Kothari and Chokshi by virtue of, among other things, the terms of a guaranty (the "Guaranty"), described in more detail below, pursuant to which Kothari and Chokshi acknowledged that they were personally bound by section 17 of the Franchise Agreement.

9.     Venue is proper in this District pursuant to section 17.6.3 of the Franchise Agreement, inasmuch as that provision contains an express waiver by Soham Investments of any objection to venue in this District.

## ALLEGATIONS COMMON TO ALL COUNTS

### The Agreements Between The Parties

10.     On or about May 26, 2005[1], SWI entered into the Franchise Agreement with Soham Investments for the operation of a 46-room Super 8® guest lodging facility located at 1916 West 3rd Street, Winslow, Arizona 86047, designated as Super 8® Site No. 03118-80713-04 (the "Facility").  A true copy of the Franchise Agreement is attached hereto as Exhibit A.

11.     Pursuant to section 5 of the Franchise Agreement, Soham Investments was obligated to operate a Super 8® guest lodging facility for a twenty-year term.

12.     Pursuant to section 7 and Schedule C of the Franchise Agreement, Soham Investments was required to make certain periodic payments to SWI for royalties, system assessments, taxes, interest, reservation system user fees and other fees (collectively, "Recurring Fees").

---

[1] By Amendment dated January 17, 2006, a copy of which is attached hereto as Exhibit B, the parties amended the Franchise Agreement to reflect that the date of execution for the Franchise Agreement was June 16, 2005.

13.     Pursuant to section 7.3 of the Franchise Agreement, Soham Investments agreed that interest is payable "on any past due amount payable to [SWI] under this [Franchise] Agreement at the rate of 1.5% per month or the maximum rate permitted by applicable law, whichever is less, accruing from the due date until the amount is paid."

14.     Pursuant to section 3.8 of the Franchise Agreement, Soham Investments was required to report the amount of gross room revenue earned by Soham Investments at the Facility for purposes of establishing the amount of royalties and other Recurring Fees due to SWI.

15.     Pursuant to section 3.8 of the Franchise Agreement, Soham Investments agreed to maintain at the Facility accurate financial information, including books, records, and accounts, relating to the gross room revenue of the Facility and, pursuant to sections 3.8 and 4.8 of the Franchise Agreement, Soham Investments agreed to allow SWI to examine, audit, and make copies of the entries in these books, records, and accounts.

16.     Pursuant to section 11.2 of the Franchise Agreement, SWI could terminate the Franchise Agreement, with notice to Soham Investments, if Soham Investments (a) discontinued operating the Facility as a Super 8® guest lodging establishment and/or (b) lost possession or the right to possession of the Facility.

17.     Pursuant to section 12.1 of the Franchise Agreement, Soham Investments agreed that, in the event of a termination of the Franchise Agreement pursuant to section 11.2, it would pay liquidated damages to SWI in accordance with a formula specified in the Franchise Agreement.

18.    Pursuant to section 17.4 of the Franchise Agreement, Soham Investments agreed that the non-prevailing party would "pay all costs and expenses, including reasonable attorneys' fees, incurred by the prevailing party to enforce this [Franchise] Agreement or collect amounts owed under this [Franchise] Agreement."

19.    Effective as of the date of the Franchise Agreement, Kothari and Chokshi provided SWI with a Guaranty of Soham Investments' obligations under the Franchise Agreement. A true copy of the Guaranty is attached hereto as Exhibit C.

20.    Pursuant to the terms of the Guaranty, Kothari and Chokshi agreed, among other things, that upon a default under the Franchise Agreement, they would "immediately make each payment and perform or cause [Soham Investments] to perform, each unpaid or unperformed obligation of [Soham Investments] under the [Franchise] Agreement."

21.    Pursuant to the terms of the Guaranty, Kothari and Chokshi agreed to pay the costs, including reasonable attorneys' fees, incurred by SWI in enforcing its rights or remedies under the Guaranty or the Franchise Agreement.

## The Termination of the Franchise Agreement

22.    On or about January 19, 2012, Soham Investments unilaterally terminated the Franchise Agreement by transferring the Facility to a third party, thereby terminating the Franchise Agreement.

23.    By letter dated May 3, 2012, a true copy of which is attached as Exhibit D, SWI acknowledged Soham Investments' unilateral termination of the Franchise Agreement effective January 19, 2012, and advised Soham Investments that it was required to pay to SWI as

liquidated damages for premature termination the sum of $92,000.00, as required under the Franchise Agreement, and all outstanding Recurring Fees through the date of termination.

## **FIRST COUNT**

24.     SWI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 23 of the Complaint.

25.     Pursuant to sections 3.8 and 4.8 of the Franchise Agreement, Soham Investments agreed to allow SWI to examine, audit, and make copies of Soham Investments' financial information, including books, records, and accounts, relating to the gross room revenue earned at the Facility.

26.     The calculation of the monetary amounts sought by SWI in this action is based on the gross room revenue information supplied to SWI by Soham Investments and, to the extent there has been non-reporting, SWI's estimate as to the gross room revenue earned by Soham Investments.

27.     The accuracy of this estimate cannot be ascertained without an accounting of the receipts and disbursements, profit and loss statements, and other financial materials, statements and books from Soham Investments.

**WHEREFORE**, SWI demands judgment ordering that Soham Investments account to SWI for any and all revenue derived as a result of marketing, promoting, or selling guest lodging services at the Facility from the inception through the date of termination of the Franchise Agreement.

## SECOND COUNT

28.     SWI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 27 of the Complaint.

29.     On or about January 19, 2012, Soham Investments unilaterally terminated the Franchise Agreement by ceasing to operate the Facility as a Super 8® guest lodging facility.

30.     By letter dated May 3, 2012, SWI acknowledged Soham Investments' unilateral termination of the Franchise Agreement effective January 19, 2012.

31.     Section 12.1 provides that, in the event of termination of the Franchise Agreement due to action of the Franchisee, Soham Investments shall pay liquidated damages to SWI within 30 days of termination.

32.     Section 12.1 of the Franchise Agreement set liquidated damages for the Facility at $2,000 multiplied by the number of guest rooms Soham Investments was authorized to operate at the Facility at the time of termination.  At the time of termination, Soham Investments was authorized to operate 46 guest rooms at the Facility.  Accordingly, the amount of liquidated damages due and owing from Soham Investments is $92,000.00.

33.     As a result of the termination of the Franchise Agreement, Soham Investments is obligated to pay SWI liquidated damages in the amount of $92,000.00, as calculated pursuant to Section 12.1.

34.     Notwithstanding SWI's demand for payment, Soham Investments has failed to pay SWI the liquidated damages as required in Section 12.of the Franchise Agreement.

35.    SWI has been damaged by Soham Investments' failure to pay liquidated damages.

**WHEREFORE**, SWI demands judgment against Soham Investments for liquidated damages in the amount of $92,000.00, together with interest, attorneys' fees, and costs of suit.

### THIRD COUNT

36.    SWI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 35 of the Complaint.

37.    By virtue of the premature termination of the Franchise Agreement, SWI sustained a loss of future revenue over the remainder of the twenty-year term of the Franchise Agreement.

38.    If the Court determines that Soham Investments is not liable to pay SWI liquidated damages as required by Section 12.1 of the Franchise Agreement, in the alternative, Soham Investments is liable to SWI for actual damages for the premature termination of the Franchise Agreement.

39.    SWI has been damaged by Soham Investments' breach of its obligation to operate a Super 8® guest lodging facility for the remaining term of the Franchise Agreement.

**WHEREFORE**, SWI demands judgment against Soham Investments for actual damages in an amount to be determined at trial, together with interest, attorneys' fees, and costs of suit.

**FOURTH COUNT**

40.     SWI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 39 of the Complaint.

41.     Pursuant to section 7 and Schedule C of the Franchise Agreement, Soham Investments was obligated to remit Recurring Fees to SWI.

42.     Despite its obligation to do so, Soham Investments failed to remit certain of the Recurring Fees due and owing under the Franchise Agreement, in the current amount of $76,857.06.

43.     Soham Investments' failure to remit the agreed Recurring Fees constitutes a breach of the Franchise Agreement and has damaged SWI.

        **WHEREFORE**, SWI demands judgment against Soham Investments for the Recurring Fees due and owing under the Franchise Agreement, in the current amount of $76,857.06, together with interest, attorneys' fees, and costs of suit.

**FIFTH COUNT**

44.     SWI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 43 of the Complaint.

45.     At the time of the termination of the Franchise Agreement, Soham Investments was obligated to pay SWI Recurring Fees.

46.    Despite its obligation to do so, Soham Investments failed to pay certain of the Recurring Fees due and owing under the Franchise Agreement, in the current amount of $76,857.06.

47.    Soham Investments' failure to compensate SWI constitutes unjust enrichment and has damaged SWI.

**WHEREFORE**, SWI demands judgment against Soham Investments for the Recurring Fees due and owing under the Franchise Agreement, in the current amount of $76,857.06, together with interest, attorneys' fees, and costs of suit.

## SIXTH COUNT

48.    SWI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 50 of the Complaint.

49.    Pursuant to the terms of the Guaranty, Kothari and Chokshi agreed, among other things, that upon a default under the Franchise Agreement, they would immediately make each payment and perform each obligation required of Soham Investments under the Franchise Agreement.

50.    Despite their obligation to do so, Kothari and Chokshi have failed to make any payments or perform or cause Soham Investments to perform each obligation required under the Franchise Agreement.

51.    Pursuant to the Guaranty, Kothari and Chokshi are liable to SWI for Soham Investments' liquidated damages in the amount of $92,000.00, or actual damages in an amount to

be determined at trial, and Soham Investments' Recurring Fees due and owing under the Franchise Agreement, in the current amount of $76,857.06.

WHEREFORE, SWI demands judgment against Kothari and Chokshi for all liquidated damages, or actual damages, and Recurring Fees due and owing under the Franchise Agreement, together with interest, attorneys' fees, and costs of suit.

**LeClairRyan**
Attorneys for Plaintiff,
Super 8 Worldwide, Inc.,
formerly known as Super 8 Motels, Inc.

By: _____
**BRYAN P. COUCH**

Dated: 10/4/15

## CERTIFICATION PURSUANT TO L. CIV. R. 11.2

I certify that, to the best of my knowledge, this matter is not the subject of any other action pending in any court or of any pending arbitration or administrative proceeding.

**LeClairRyan**
Attorneys for Plaintiff,
Super 8 Worldwide, Inc.,
formerly known as Super 8 Motels, Inc.

By:_____
   **BRYAN P. COUCH**

Dated: 10/8/15

# EXHIBIT A

Location: **Winslow, Arizona**
Entity No. **80713**
Unit No.: **3118**

## SUPER 8 MOTELS, INC.
## FRANCHISE AGREEMENT

THIS FRANCHISE AGREEMENT ("Agreement"), dated _May 26_, 200 _5_, is between **SUPER 8 MOTELS, INC.**, a South Dakota corporation ("we", "our" or "us"), and **SOHAM INVESTMENTS LLC**, an Arizona limited liability company ("you"). The definitions of capitalized terms are found in Appendix A. In consideration of the following mutual promises, the parties agree as follows:

This transaction involves the transfer of an existing Chain Facility at the Location first granted to **A.D. Patel** ("Prior Franchisee") in a Franchise Agreement with us dated **October 14, 1983** (the "Prior Agreement"). You assume and obligate yourself to perform any and all of the obligations (financial and otherwise) of the Prior Franchisee under the Prior Agreement that is not paid or performed as of the date of this Agreement, including without limitation, the obligation to pay any unpaid Royalties, System Assessment Fees or other amounts due us and to correct any uncured defaults other than as expressly superseded by this Agreement. You acknowledge that we may require you or your staff to complete training on the use of a property management or similar computer system for accessing the Reservation System and pay our retraining fee.

1.      **License.**  We have the exclusive right to license and franchise to you the distinctive "Super 8" System for providing economy lodging motel services. We grant to you and you accept the License, effective and commencing on the Opening Date and ending on the earliest to occur of the Term's expiration or a Termination. The License is effective only at the Location and may not be transferred or relocated. You will call the Facility a "Super 8 Motel" and you may adopt additional or secondary designations for the Facility with our prior written consent, which we may withhold, condition, or withdraw on written notice in our sole discretion. You shall not affiliate or identify the Facility with another franchise system, reservation system, brand, cooperative or registered mark during the Term.

2.      **Protected Territory.**  We will not own, operate, lease, manage, or license anyone but you to operate a Chain Facility of the same name (Super 8 Motel) in the "Protected Territory", defined in Appendix A, while this Agreement is in effect. We may own, operate, lease, manage, franchise or license anyone to operate any Chain Facility located anywhere outside the Protected Territory without any restriction or obligation to you. We may grant Protected Territories for other Chain Facilities that overlap your Protected Territory. While this Agreement is in effect, neither you nor your officers, directors, general partners or owners of 25% or more of your Equity Interests, may own, operate, lease, manage or franchise any guest lodging facility other than the Facility in the Protected Territory (other than the Facility) unless we or our affiliate licenses the facility. You will use any information obtained through the Reservation System to refer guests, directly or indirectly, only to Chain Facilities. This Section does not apply to any Chain Facility located in the Protected Territory on the Effective Date, which we may renew, relicense, allow to expand, or replace with a replacement Facility located with the same trading area having not more than 120% of the guest rooms of the replaced Chain Facility if its franchise with us terminated or is not renewed. The Protected Territory fairly represents the Facility's trading area, and you acknowledge that. There are no express or implied territorial rights or agreements between the parties except as stated in this

1

Section. The covenants in this Section are mutually dependent; if you breach this Section, your Protected Territory will be the Location only.

**3.    Your Improvement and Operating Obligations.**  Your obligations to improve, operate and maintain the Facility are:

3.1    **Improvements.**  You must select and acquire the Location and the Facility and acquire, equip and supply the Facility in accordance with System Standards for entering conversion facilities.  You must begin improvement of the Facility no later than thirty (30) days after the Effective Date.  The Facility must score 200 or fewer points (or equivalent score under a successor quality assurance scoring system we employ), within ninety (90) days after the Effective Date. You must thereafter continue renovation and improvement of the Facility as the Punch List requires and pass any related quality assurance inspection within nine (9) months after the Effective Date. All improvements will comply with System Standards, any Approved Plans, Schedule B and any Punch List attached to this Agreement.  Your general contractor or you must carry the insurance required under this Agreement during renovation.  If you do not commence or complete the improvement of the Facility by the dates specified in this Section 3.1, or the Facility does not meet the post-transfer quality assurance inspection standard or complete the post-transfer improvements specified in the Punch List after the Effective Date, then we may, in our sole discretion, terminate this Agreement by giving written notice to you.  Time is of the essence for the Improvement Obligation.  We may, however, in our sole discretion, grant one or more extensions of time to perform any phase of the Improvement Obligation. The grant of an extension will not waive any other default existing at the time the extension is granted.

3.2    **Improvement Plans.**  You will create plans and specifications for the work described in Section 3.1 (based upon the System Standards and this Agreement) if we so request and submit them for our approval before starting improvement of the Location.  We will not unreasonably withhold or delay our approval, which is intended only to test compliance with System Standards, and not to detect errors or omissions in the work of your architects, engineers, contractors or the like.  Our review does not cover technical, architectural or engineering factors, or compliance with federal, state or local laws, regulations or code requirements.  We will not be liable to you or your lenders, contractors, employees, guests or others on account of our review or approval of your plans, drawings or specifications, or our inspection of the Facility before, during or after renovation or construction.  Any material modifications to or variations from the Approved Plans require our prior written approval.  You will promptly provide us with copies of permits, job progress reports, and other information as we may reasonably request.  We may inspect the work while in progress without prior notice.

3.3  **Opening.**  You may continue to identify the Facility as part of the System prior to completing the Improvement Obligation.

3.4    **Operation.**  You will operate and maintain the Facility continuously after the Opening Date on a year-round basis as required by System Standards and offer transient guest lodging and other related services of the Facility (including those specified on Schedule B) to the public in compliance with the law and System Standards.  You will not operate a Food and Beverage service without our prior written consent, except for a complimentary coffee service/continental breakfast in accordance with System Standards.  If you do not manage the Chain Facility personally, you must employ a full-time general manager who will be dedicated solely to the Facility.  You will keep the Facility in a clean, neat, and sanitary condition.  You will clean, repair, replace, renovate, refurbish, paint, and

2

redecorate the Facility and its FF&E as and when needed to comply with System Standards. The Facility will accept payment from guests by all credit and debit cards we designate in the System Standards Manual. You may add to or discontinue the amenities, services and facilities described in Schedule B, or to lease or subcontract any service or portion of the Facility only with our prior written consent, which we will not unreasonably withhold or delay. Your front desk operation, telephone system, parking lot, swimming pool and other guest service facilities may not be shared with or used by guests of another lodging or housing facility.

3.5     **Training.** If this is your first System franchise, you or one of your principal owners will attend an orientation program as described in Section 4.1. The Facility's initial and any replacement general manager must complete to our satisfaction the manager training program described in Section 4.1, even if you employ other managers for other Chain Facilities who have already received such training. You will train or cause the training of all Facility personnel as and when required by System Standards and this Agreement. You will pay all travel, lodging, meals and compensation expenses of the people you send for training programs, tuition, and all travel, lodging, meal and facility and equipment rental expenses of our representatives if training is provided at the Facility.

3.6     **Marketing.**

3.6.1    You will participate in System marketing programs, including the Directory and the Reservation System. You will obtain and maintain the computer and communications service and equipment we specify to participate in the Reservation System. You will comply with our rules and standards for participation, and will honor reservations and commitments to guests and travel industry participants. You authorize us to offer and sell reservations for rooms and services at the Facility according to the rules of participation and System Standards. You may implement, at your option and expense, your own local advertising. Your advertising materials must use the Marks correctly, and must comply with System Standards or be approved in writing by us prior to publication. You will stop using any non-conforming, out-dated or misleading advertising materials if we so request.

3.6.2    The Facility must participate in our Chain-wide Internet marketing activities like other marketing programs. You will discontinue any Internet marketing that conflicts, in our reasonable discretion, with Chain-wide Internet marketing activities. You must honor the terms of any participation agreement you sign for Internet marketing. You shall pay when due any fees, commissions, charges and reimbursements relating to Internet marketing activities (i) in which you agree to participate, or (ii) that we designate as mandatory on a Chain-wide basis, provided that the activities carry aggregate fees per transaction of not more than the sum of the full agent commission specified on Schedule C for sales agents, plus 10% of the Chain's reported average daily rate for the preceding calendar year. We may suspend the Facility's participation in Internet marketing activity if you default under this Agreement.

3.7     **Governmental Matters.** You will obtain as and when needed all governmental permits, licenses and consents required by law to construct, acquire, renovate, operate and maintain the Facility and to offer all services you advertise or promote. You will pay when due or properly contest all federal, state and local payroll, withholding, unemployment, beverage, permit, license, property, ad valorem and other taxes, assessments, fees, charges, penalties and interest, and will file when due all governmental returns, notices and other filings. You will comply with all applicable federal, state and local laws, regulations and orders applicable to you and/or the Facility, including those combating terrorism such as the USA Patriot Act and Executive Order 13224.

3

3.8     **Financial Books & Records; Audits.**

3.8.1   The Facility's transactions must be timely and accurately recorded in accounting books and records prepared on an accrual basis compliant with generally accepted accounting principles of the United States ("GAAP") and consistent with the most recent edition of the Uniform System of Accounts for the Lodging Industry published by the American Hotel & Motel Association, as modified by this Agreement and System Standards. You acknowledge that your accurate accounting for and reporting of Gross Room Revenues is a material obligation you accept under this Agreement.

3.8.2   We may notify you of a date on which we propose to audit the Facility's books and records. You will be deemed to confirm our proposed date unless you follow the instructions with the audit notice for changing the date. You need to inform us where the books and records will be produced. You need to produce for our auditors at the confirmed time and place for the audit the books, records, tax returns and financial statements relating to the Facility for the applicable accounting periods we require under this Agreement and System Standards. If our auditors must return to your location after the first date we confirm for the audit because you violate this Section 3.8.2 or refuse to cooperate with the reasonable requests of our auditors, you must pay us the Audit Fee under Section 4.8 when invoiced. We may also perform an audit of the Facility's books and records without advance notice. Your staff must cooperate with and assist our auditors to perform any audit we conduct.

3.8.3   We will notify you in writing if you default under this Agreement because (i) you do not cure a violation of Section 3.8.2 within 30 days after the date of the initial audit, (ii) you cancel 2 or more previously scheduled audits, (iii) you refuse to admit our auditors for an audit during normal business hours at the place where you maintain the Facility's books and records, or refuse to produce the books and records required under this Agreement and System Standards for the applicable accounting periods, (iv) our audit determines that the books and records you produced are incomplete or show evidence of tampering or violation of generally accepted internal control procedures, or (v) our audit determines that that you have reported to us less than 97% of the Facility's Gross Room Revenues for any fiscal year preceding the audit. Our notice of default may include, in our sole discretion and as part of your performance needed to cure the default under this Section 3.8, an "Accounting Procedure Notice." You must also pay any deficiency in Recurring Fees or other charges we identify and invoice as a result of the audit. The Accounting Procedure Notice requires that you obtain and deliver to us, within 90 days after the end of each of your next three fiscal years ending after the Accounting Procedure Notice, an audit opinion signed by an independent certified public accountant who is a member of the American Institute of Certified Public Accountants addressed to us that the Facility's Gross Room Revenues you reported to us during the fiscal year fairly present the Gross Room Revenues of the Facility computed in accordance with this Agreement for the fiscal year.

3.9     **Inspections.** You acknowledge that the Facility's participation in our quality assurance inspection program (including unannounced inspections) is a material obligation you accept under this Agreement. You will permit our representatives to perform quality assurance inspections of the Facility at any time with or without advance notice. The inspections will commence during normal business hours although we may observe Facility operation at any time. You and the Facility staff will cooperate with the inspector performing the inspection. If the Facility fails an inspection, you refuse to cooperate with our inspector, or you refuse to comply with our published inspection System Standards, then you will pay us when invoiced for

SUPEXC1
179957.2 Q2/05



any reinspection fee specified in System Standards Manuals (which is $750 on the Effective Date and will not exceed $2,500) plus the reasonable travel, lodging and meal costs our inspector incurs for a reinspection. We may also conduct paper and electronic customer satisfaction surveys of your guests and include the results in your final quality assurance score. We may publish and disclose the results of quality assurance inspections and guest surveys.

3.10    **Insurance.** You will obtain and maintain during the Term of this Agreement the insurance coverage required under the System Standards Manual from insurers meeting the standards established in the Manual. Unless we instruct you otherwise, your liability insurance policies will name Super 8 Motels, Inc., Cendant Hotel Group, Inc. and Cendant Corporation, their successors and assigns as additional insureds.

3.11    **Conferences.** Chain conferences are held on either a chain-wide or regional basis. You or your representative must attend each Chain conference and pay the Conference Fee we set for Chain franchisees, if and when we determine to hold a Chain Conference. If you operate other lodging facilities under the System in addition to the Facility, you must send a different representative to the Chain conference and pay another Conference Fee for each facility. We will charge you and you must pay the Conference Fee even if you do not attend the Chain conference. You will receive reasonable notice of a Chain conference.

3.12    **Purchasing.** You will purchase or obtain certain items we designate as proprietary or that bear Marks, such as signage, only from suppliers we approve. You may purchase any other items for the Facility from any competent source you select, so long as the items meet or exceed System Standards.

3.13    **Good Will.** You will use reasonable efforts to protect, maintain and promote the name "Super 8 Motels" and its distinguishing characteristics, and the other Marks. You will not permit or allow your officers, directors, principals, employees, representatives, or guests of the Facility to engage in, conduct which is unlawful or damaging to the good will or public image of the Chain or System. You will follow System Standards for identification of the Facility and for you to avoid confusion on the part of guests, creditors, lenders, investors and the public as to your ownership and operation of the Facility, and the identity of your owners. You will refer any guest that the Facility cannot accommodate to the nearest Chain Facility unless and until the guest expresses a preference for a different lodging facility. You will participate in any Chain-wide guest service and satisfaction guaranty programs we require in good faith for all Chain Facilities.

3.14    **Facility Modifications.** You may materially modify, diminish or expand the Facility (or change its interior design, layout, FF&E, or facilities) only after you receive our prior written consent, which we will not unreasonably withhold or delay. You will pay our Rooms Addition Fee then in effect for each additional guest room you may add to the Facility over 120 rooms. If we so request, you will obtain our prior written approval of the plans and specifications for any material modification, which we will not unreasonably withhold or delay. You will not open to the public any material modification until we inspect it for compliance with the Approved Plans and System Standards.

3.15    **Courtesy Lodging.** You will provide lodging at the "Employee Rate" established in the System Standards Manual from time to time (but only to the extent that adequate room vacancies exist) to our representatives traveling on business, but not more than three standard guest rooms at the same time.

5

3.16  **Minor Renovations.**  Beginning three years after the Opening Date, we may issue a "Minor Renovation Notice" to you that will specify reasonable Facility upgrading and renovation requirements (a "Minor Renovation") to be commenced no sooner than 90 days after the notice is issued, having an aggregate cost for labour, FF&E and materials estimated by us to be not more than the Minor Renovation Ceiling Amount.  You will perform the Minor Renovations as and when the Minor Renovation Notice requires.  We will not issue a Minor Renovation Notice within three years after the date of a prior Minor Renovation Notice, or if the three most recent quality assurance inspection scores of the Facility averaged no more than 200 points and the most recent quality assurance inspection score for the Facility was no more than 225 points (or equivalent scores under a successor quality assurance scoring system we employ), when the Facility is otherwise eligible for a Minor Renovation.

4.  **Our Operating and Service Obligations.**  We will provide you with the following services and assistance:

4.1  **Training.**  We may offer (directly or indirectly by subcontracting with an affiliate or a third party) general manager and owner orientation training, on-site opening training, remedial training and supplemental training.

4.1.1  **General Manager Orientation Training.**  We will offer at a location in the United States we designate a general manager orientation training program.  The program will not exceed two weeks in duration and will cover such topics as System Standards, services available from us, and operating a Chain Facility.  Your initial general manager (or other representative who exercises day to day operational authority) for the Facility must complete this program to our satisfaction before the Opening Date. If we do not offer a place in general manager orientation within that time frame, your general manager must attend the next program held at which we offer a place.  Any replacement general manager must complete general manager orientation within 90 days after he/she assumes the position or the next program available, whichever comes later.  Your general manager for the Facility must complete general manager orientation even if you employ managers at other Chain Facilities who have already received this training.  We charge you tuition of $1,250 for your first general manager if you open the Facility with our approval and your general manager completes general manager orientation within the time period established under this Agreement.  You must pay the tuition then in effect as disclosed in our latest Uniform Franchise Offering Circular ("UFOC"), but not more than $3,000, if you do not meet these deadlines.  For any supplemental or replacement general manager, you must pay the tuition in effect for the program when your manager attends the program.  You must also pay for your manager's travel, lodging, meals, incidental expenses, compensation and benefits.

4.1.2  **Owner Orientation Training.**  We will offer an owner orientation training program to familiarize you with the System, the Chain, and our services.  If this is your first System franchise, you (or a person with executive authority if you are an entity) must attend owner orientation preferably before, but not later than 90 days after the Opening Date. If we do not offer owner orientation training within this time period, you must attend the next program offered. Financial institutions and real estate mortgage investment conduits are exempt from the obligation to attend owner orientation, but may choose to do so at their option.  Owner orientation will be no longer than five days.  We charge you tuition of $825 if you open the Facility with our approval and attend owner orientation within the time periods established under this Agreement.  If you do not open the Facility and attend orientation by such deadlines, you must pay the tuition then in effect for this program as disclosed in our latest UFOC, but not more than $3,000.  You must also pay your travel, lodging, meal and incidental expenses.

6

4.1.3 **On-Site Opening Training.** We will provide, and your staff must attend, on-site opening training (at our discretion as to length and scheduling) to assist you in opening the Facility. We currently do not charge tuition for this program. You will pay the cost of any site used if the Facility is not available and the rent for any equipment we need. You must provide lodging for our trainers at your expense. You must also pay, at our request, the reasonable travel, meal and out-of-pocket expenses incurred by our trainers for on-site opening training.

4.1.4 **Remedial Training.** We may require you, your general manager and/or your staff to participate in on-site remedial training if the Facility fails multiple quality assurance inspections and/or experiences significant complaints to our guest services department, as a condition to avoiding termination or to resumption of reservation service. You must pay the tuition in effect for this program when it is offered to you, and you must provide lodging for our trainers. As of March 31, 2003, tuition for remedial on-site training is $450 per day, which must be paid before the training commences. We may increase the tuition charge in the future. The length of the remedial training could be up to five days, depending on the severity of the quality assurance and/or customer service issues.

4.1.5 **Supplemental Training.** We may offer other mandatory or optional training programs for reasonable tuition or without charge. This training could be held in our U.S. training center or other locations. You will pay for your representative's travel, lodging, meals, incidental expenses, compensation and benefits and any tuition charge we establish for this training. This training may be held in conjunction with a Chain Lodging conference. We may offer, rent or sell to you video tapes, computer discs or other on-site training aids and materials, or require you to buy them at reasonable prices. We may also offer Internet-based training via the Chain's intranet website.

4.1.6 **Cancellation Fees.** We will charge you a cancellation fee of 100% of the tuition for a program if you cancel your participation less than 15 days before it is scheduled to be held or if you fail to attend a training program as scheduled without notifying us in advance. This fee is non-refundable and you will also be charged the full tuition in effect for the program when you reschedule your training.

4.2     **Reservation System.** We will operate and maintain (directly or by subcontracting with an affiliate or one or more third parties) a computerized Reservation System or such technological substitute(s) as we determine, in our discretion. We will use System Assessment Fees as specified in Schedule C, allocated in our discretion from the Advertising and Reservation Fund, for the acquisition, development, support, equipping, maintenance, improvement and operation of the Reservation System. We will provide software maintenance for the software we license to you to connect to the Reservation System if you are up to date in your payment of Recurring Fees and all other fees you must pay under any other agreement with us or our affiliate. The Facility will participate in the Reservation System, commencing with the Opening Date for the balance of the Term. We have the right to provide reservation services to lodging facilities other than Chain Facilities or to other parties. We may use funds in the Advertising and Reservation Fund to reimburse our reasonable direct and indirect costs, overhead or other expenses of operating the Reservation System.

4.3     **Marketing**

4.3.1     We will use System Assessment Fees, allocated in our discretion from the Advertising and Reservation Fund, to promote public awareness and usage of Chain Facilities by implementing

7



appropriate international, national, regional and local advertising, promotion, publicity, market research and other marketing programs, training programs and related activities, and the production and distribution of System publications and directories of hotels. We will determine in our discretion: (i) The nature and type of media placement; (ii) The allocation (if any) among international, national, regional and local markets; and (iii) The nature and type of advertising copy, other materials and programs. System Assessment Fees may reimburse us or an affiliate for the reasonable direct and indirect costs, overhead or other expenses of providing marketing services. We are not obligated to supplement the Advertising and Reservation Fund or to advance funds to pay for System marketing activities. We do not promise that you or the Facility will benefit directly or proportionately from System marketing activities.

4.3.2   We may, at our discretion, implement special international, national, regional or local promotional programs (which may or may not include the Facility) and may make available to you (to use at your option) media advertising copy and other marketing materials for prices which reasonably cover the materials' direct and indirect costs.

4.3.3   We may, at our discretion, implement "group booking" programs created to encourage use of Chain Facilities for tours, conventions and the like, possibly for separate fees in addition to the System Assessment Fee, for any resulting group booking accepted at the Facility.

4.3.4   We will publish the Chain Directory. We will supply Directories to you for display at locations specified in the System Standards Manual or policy statements. We will include the Facility in the Chain Directory after it opens if you submit the information we request on time, and you are not in default under this Agreement at the time we must arrange for publication. We may assess a reasonable charge for the direct and indirect expenses (including overhead) of producing and delivering the Directories.

4.4      **Purchasing.** We may offer optional assistance to you with purchasing items used at or in the Facility. Our affiliates may offer this service on our behalf. We may restrict the vendors authorized to sell proprietary or Mark-bearing items in order to control quality, provide for consistent service or obtain volume discounts. We will maintain and provide to you lists of suppliers approved to furnish Mark-bearing items, or whose products conform to System Standards.

4.5      **The System.** We will control and establish requirements for all aspects of the System. We may, in our discretion, change, delete from or add to the System, including any of the Marks or System Standards, in response to changing market conditions. We may, in our discretion, permit deviations from System Standards, based on local conditions and our assessment of the circumstances.

4.6      **Consultations and Standards Compliance.** We will assist you to understand your obligations under System Standards by telephone, mail, during quality assurance inspections, through the System Standards Manual, at training sessions and during conferences and meetings we conduct. We will provide telephone and mail consultation on matters of Facility operation and marketing through our representatives. We will offer you access to any Internet website we may maintain to provide Chain franchisees with information and services, subject to any rules, policies and procedures we establish for its use and access and to this Agreement. We may limit or deny access to any such website while you are in default under this Agreement.

4.7      **System Standards Manual and Other Publications.** We will specify System Standards in the System Standards Manual, policy statements or other publications. We will lend you one copy

8




of the System Standards Manual promptly after we sign this Agreement. We will send you any System Standards Manual revisions and/or supplements as and when issued. We will send you all other publications for Chain franchisees and all separate policy statements in effect from time to time.

4.8    **Inspections and Audits.** We have the unlimited right to conduct unannounced quality assurance inspections of the Facility and its operations, records and Mark usage to test the Facility's compliance with System Standards and this Agreement, and the audits described in Section 3.8. We have the unlimited right to reinspect if the Facility does not achieve the score required on an inspection. We may impose a reinspection fee and will charge you for our costs as provided in Section 3.9. You will pay us an "Audit Fee" of $300.00 when we invoice you for an Audit Fee under Section 3.8. We may increase the Audit Fee on a Chain-wide basis to cover any increases in our audit costs to not more than $500.00, effective any time after December 31, 2005. Our inspections are solely for the purposes of checking compliance with System Standards.

5.    <u>Term.</u>  The Term begins on the Effective Date and expires at the end of the twentieth License Year. Some of your duties and obligations will survive termination or expiration of this Agreement. NEITHER PARTY HAS RENEWAL RIGHTS OR OPTIONS.

6. <u>Application and Relicense Fees.</u>  We should receive from you a non-refundable Application Fee of $1,000.00. You will pay us a non-refundable Relicense Fee in the amount of **$24,000.00**, when you sign this Agreement, which is fully earned when we sign this Agreement.

7.    <u>Recurring Fees, Taxes and Interest.</u>

7.1    You will pay us certain "Recurring Fees" in U.S. dollars (or such other currency as we may direct if the Facility is outside the United States) 15 days after the month in which they accrue, without billing or demand. Recurring Fees include the following:

7.1.1    A "<u>Royalty</u>" equal to five percent (5%) of Gross Room Sales of the Facility accruing during the calendar month, accrues from the earlier of the Opening Date or the date you identify the Facility as a Chain Facility or operate it under a Mark until the end of the Term.

7.1.2    A "<u>System Assessment Fee</u>" as stated in Schedule C to be paid into the Advertising and Reservation Fund, accrues from the Opening Date until the end of the Term, including during suspension periods. Upon 60 days written notice, we may change the System Assessment Fee after the tenth anniversary of the Effective Date to cover costs as described in Schedule C. You will also pay or reimburse us as described in Schedule C for "<u>Additional Fees</u>" such as travel and other sales agent commissions paid for certain reservations at the Facility plus a reasonable service charge, a "GDS Fee" levied to pay for reservations for the Facility originated or processed through the Global Distribution System, the Internet, or other reservation systems and networks, and fees for additional services and programs. We may increase or adjust the Additional Fees to cover the cost of the services or to add new services or programs at any time on not less than 60 days prior written notice.

7.2    "<u>Taxes</u>" are equal to any federal, state or local sales, gross receipts, use, value added, excise or similar taxes assessed against us on the Recurring Fees by the jurisdictions where the Facility is located, but not including any income tax, franchise or other tax for our privilege of doing business in your State. You will pay Taxes directly to us when due.

9

7.3    "Interest" is payable on any past due amount payable to us under this Agreement at the rate of 1.5% per month or the maximum rate permitted by applicable law, whichever is less, accruing from the due date until the amount is paid.  Interest is payable when you receive our invoice.

7.4    If a Transfer occurs, your transferee or you will pay us a "Relicense Fee" equal to the Initial Fee we would then charge a new franchisee for the Facility.

## 8.    Indemnifications.

8.1    Independent of your obligation to procure and maintain insurance, you will indemnify, defend and hold the Indemnitees harmless, to the fullest extent permitted by law, from and against all Losses and Expenses, incurred by any Indemnitee for any investigation, claim, action, suit, demand, administrative or alternative dispute resolution proceeding, relating to or arising out of any transaction, occurrence or service at, or involving the operation of, the Facility, any payment you make or fail to make to us, any breach or violation of any contract or any law, regulation or ruling by, or any act, error or omission (active or passive) of, you, any party associated or affiliated with you or any of the owners, officers, directors, employees, agents or contractors of you or your affiliates, including when you are alleged or held to be the actual, apparent or ostensible agent of the Indemnitee, or the active or passive negligence of any Indemnitee is alleged or proven.  You have no obligation to indemnify an Indemnitee for damages to compensate for property damage or personal injury if a court of competent jurisdiction makes a final decision not subject to further appeal that the Indemnitee engaged in willful misconduct or intentionally caused such property damage or bodily injury.  This exclusion from the obligation to indemnify shall not, however, apply if the property damage or bodily injury resulted from the use of reasonable force by the Indemnitee to protect persons or property.

8.2    You will respond promptly to any matter described in the preceding paragraph, and defend the Indemnitee.  You will reimburse the Indemnitee for all costs of defending the matter, including reasonable attorneys' fees, incurred by the Indemnitee if your insurer or you do not assume defense of the Indemnitee promptly when requested, or separate counsel is appropriate, in our discretion, because of actual or potential conflicts of interest.  We must approve any resolution or course of action in a matter that could directly or indirectly have any effect on parties other than you and the complaining party in the matter, or could serve as a precedent for other matters.

8.3    We will indemnify, defend and hold you harmless, to the fullest extent permitted by law, from and against all Losses and Expenses, incurred by you in any action or claim arising from your proper use of the System alleging that your use of the System and any property we license to you is an infringement of a third party's rights to any trade secret, patent, copyright, trademark, service mark or trade name.  You will promptly notify us in writing when you become aware of any alleged infringement or an action is filed against you.  You will cooperate with our defense and resolution of the claim.  We may resolve the matter by obtaining a license of the property for you at our expense, or by requiring that you discontinue using the infringing property or modify your use to avoid infringing the rights of others.

## 9.    Your Assignments, Transfers and Conveyances.

9.1    **Transfer of the Facility.**  This Agreement is personal to you (and your owners if you are an entity).  We are relying on your experience, skill and financial resources (and that of your owners and the guarantors, if any) to sign this Agreement with you.  You may finance the Facility and grant

10

a lien, security interest or encumbrance on it without notice to us or our consent. If a Transfer is to occur, the transferee or you must comply with Section 9.3. Your License is subject to termination when the Transfer occurs. The License is not transferable to your transferee, who has no right or authorization to use the System and the Marks when you transfer ownership or possession of the Facility. The transferee may not operate the Facility under the System, and you are responsible for performing the post-termination obligations in Section 13. You and your owners may, only with our prior written consent and after you comply with Sections 9.3 and 9.6, assign, pledge, transfer, delegate or grant a security interest in all or any of your rights, benefits and obligations under this Agreement, as security or otherwise. Transactions involving Equity Interests that are not Equity Transfers do not require our consent and are not Transfers.

9.2  **Public Offerings and Registered Securities.**  You may engage in the first registered public offering of your Equity Interests only after you pay us a public offering fee equal to $25,000. Your Equity Interests (or those of a person, parent, subsidiary, sibling or affiliate entity, directly or indirectly effectively controlling you), are freely transferable without the application of this Section if they are, on the Effective Date, or after the public offering fee is paid, they become, registered under the federal Securities Act of 1933, as amended, or a class of securities registered under the Securities Exchange Act of 1934, as amended, or listed for trading on a national securities exchange or the automated quotation system of the National Association of Securities Dealers, Inc. (or any successor system), provided that any tender offer for at least a majority of your Equity Interests will be an Equity Transfer subject to Section 9.1.

9.3  **Conditions.**  We may, to the extent permitted by applicable law, condition and withhold our consent to a Transfer when required under this Section 9 until the transferee and you meet certain conditions. If a Transfer is to occur, the transferee (or you, if an Equity Transfer is involved) must first complete and submit our Application, qualify to be a franchisee in our sole discretion, given the circumstances of the proposed Transfer, provide the same supporting documents as a new franchise applicant, pay the Application and Relicense Fees then in effect, sign the form of Franchise Agreement we then offer in conversion transactions and agree to renovate the Facility as we reasonably determine, if the Facility achieves a score of less than "Satisfactory" on its most recent Quality Assurance inspection. We will provide a Punch List of improvements we will require after we receive the transferee's Application. We may require structural changes to the Facility if it no longer meets System Standards for entering conversion facilities, or in, the alternative, condition our approval of the Transfer on one or more of the following: limit the transferee's term to the balance of your Term, add a right to terminate without cause exercisable by either party after a period of time has elapsed, or allow you to terminate the License when you sell the Facility and pay us Liquidated Damages under Section 12.1 at the same rate as you would pay if the termination occurred before the Opening Date. Such payment would be due and payable when you transfer possession of the Facility. We must also receive general releases from you and each of your owners, and payment of all amounts then owed to us and our affiliates by you, your owners, your affiliates, the transferee, its owners and affiliates, under this Agreement or otherwise. Our consent to the transaction will not be effective until these conditions are satisfied.

9.4  **Permitted Transferee Transactions.**  You may transfer an Equity Interest or effect an Equity Transfer to a Permitted Transferee without obtaining our consent, renovating the Facility or paying a Relicense Fee or Application Fee. No Transfer will be deemed to occur. You also must not be in default and you must comply with the application and notice procedures specified in Sections 9.3 and 9.6. Each Permitted Transferee must first agree in writing to be bound by this Agreement, or at our option, execute the Franchise Agreement form then offered prospective franchisees. No transfer

11

to a Permitted Transferee shall release a living transferor from liability under this Agreement or any guarantor under any Guaranty of this Agreement. You must comply with this Section if you transfer the Facility to a Permitted Transferee. A transfer resulting from a death may occur even if you are in default under this Agreement.

9.5 **Attempted Transfers.** Any transaction requiring our consent under this Section 9 in which our consent is not first obtained shall be void, as between you and us. You will continue to be liable for payment and performance of your obligations under this Agreement until we terminate this Agreement, all your financial obligations to us are paid and all System identification is removed from the Facility.

9.6 **Notice of Transfers.** You will give us at least 30 days prior written notice of any proposed Transfer or Permitted Transferee transaction. You will notify us when you sign a contract to Transfer the Facility and 10 days before you intend to close on the transfer of the Facility. We will respond to all requests for our consent and notices of Permitted Transferee transactions within a reasonable time not to exceed 30 days. You will notify us in writing within 30 days after a change in ownership of 25% or more of your Equity Interests that are not publicly held or that is not an Equity Transfer, or a change in the ownership of the Facility if you are not its owner. You will provide us with lists of the names, addresses, and ownership percentages of your owner(s) at our request.

**10.    Our Assignments.** We may assign, delegate or subcontract all or any part of our rights and duties under this Agreement, including by operation of law, without notice and without your consent. We will have no obligations to you after you are notified that our transferee has assumed our obligations under this Agreement except those that arose before we assign this Agreement.

**11.    Default and Termination.**

11.1    **Default.** In addition to the matters identified in Sections 3.1 and 3.8 you will be in default under this Agreement if (a) you do not pay us when a payment is due under this Agreement or any other instrument, debt, agreement or account with us related to the Facility, (b) you do not perform any of your other obligations when this Agreement and the System Standards Manual require, or (c) if you otherwise breach this Agreement. If your default is not cured within ten days after you receive written notice from us that you have not filed your monthly report, paid us any amount that is due or breached your obligations regarding Confidential Information, or within 30 days after you receive written notice from us of any other default (except as noted below), then we may terminate this Agreement by written notice to you under Section 11.2. We will not exercise our right to terminate if you have completely cured your default, or until any waiting period required by law has elapsed. In the case of default resulting from the Facility's failure to meet Quality Standards as measured by a quality assurance inspection, you must act diligently to cure the default and resolve health, safety, cleanliness and housekeeping failures identified in the inspection report within 30 days after the failing inspection. Within 90 days after the failing inspection, you must also cure the remaining items identified in the inspection report and renovate and improve the Facility to meet our then current System Standards for entering conversion properties (or other standards specified under System Standards if we are not then accepting conversions) to cure the default. At your request, we will determine and provide a written improvement plan to assist your efforts to cure the default.

11.2    **Termination.**  We may terminate the License, or this Agreement if the Opening Date has not occurred, effective when we send written notice to you or such later date as required by law or as stated in the default notice, when (1) you do not cure a default as provided in Section 11.1 or we are authorized to terminate under Section 3.1, (2) you discontinue operating the Facility as a "Super 8 Motel", (3) you do or perform, directly or indirectly, any act or failure to act that in our reasonable judgment is or could be injurious or prejudicial to the goodwill associated with the Marks or the System, (4) you lose possession or the right to possession of the Facility, (5) you (or any guarantor) suffer the termination of another license or franchise agreement with us or one of our affiliates, (6) you intentionally maintain false books and records or submit a materially false report to us, (7) you (or any guarantor) generally fail to pay debts as they come due in the ordinary course of business, (8) you, any guarantor or any of your owners or agents misstated to us or omitted to tell us a material fact to obtain or maintain this Agreement with us, (9) you receive two or more notices of default from us in any one year period (whether or not you cure the defaults), (10) a violation of Section 9 occurs, (11) you or any of your Equity Interest owners contest in court the ownership or right to license or franchise all or any part of the System or the validity of any of the Marks, (12) you, any guarantor or the Facility is subject to any voluntary or involuntary bankruptcy, liquidation, dissolution, receivership, assignment, reorganization, moratorium, composition or a similar action or proceeding that is not dismissed within 60 days after its filing, or (13) you maintain or operate the Facility in a manner that endangers the health or safety of the Facility's guests.

11.3    **Casualty and Condemnation.**

11.3.1    You will notify us promptly after the Facility suffers a Casualty that prevents you from operating in the normal course of business, with less than 75% of guest rooms available.  You will give us information on the availability of guest rooms and the Facility's ability to honor advance reservations.  You will tell us in writing within 60 days after the Casualty whether or not you will restore, rebuild and refurbish the Facility to conform to System Standards and its condition prior to the Casualty.  This restoration will be completed within 180 days after the Casualty.  You may decide within the 60 days after the Casualty, and if we do not hear from you, we will assume that you have decided, to terminate the License, effective as of the date of your notice or 60 days after the Casualty, whichever comes first.  If the License so terminates, you will pay all amounts accrued prior to termination and follow the post-termination requirements in Section 13.  You will not be obligated to pay Liquidated Damages if the Facility will no longer be used as a transient lodging facility after the Casualty.

11.3.2    You will notify us in writing within 10 days after you receive notice of any proposed Condemnation of the Facility, and within 10 days after receiving notice of the Condemnation date.  This Agreement will terminate on the date the Facility or a substantial portion is conveyed to or taken over by the condemning authority.

11.3.3  The exclusive territory covenants in Section 2 will terminate when you give us notice of any proposed Condemnation or that you will not restore the Facility after a Casualty.

11.4    **Our Other Remedies.**  If you violate your covenant in Section 2, we may reduce the Protected Territory to the Location.  We may suspend the Facility from the Reservation System for any default or failure to pay or perform under this Agreement or any other written agreement with us relating to the Facility, discontinue  Reservation System referrals to the Facility for the duration of such suspension, and may divert previously made reservations to other Chain Facilities after giving notice of non-performance, non-payment or default.  All Reservation System User Fees

13

accrue during the suspension period. Reservation service will be restored after you have fully cured any and all defaults and failures to pay and perform. We may charge you, and you must pay as a condition precedent to restoration of reservation service, a Service Interruption Fee specified on Schedule C to reimburse us for our costs associated with service suspension and restoration. We may omit the Facility from the Directory if you are in default on the date we must determine which Chain Facilities are included in the Directory. You recognize that any use of the System not in accord with this Agreement will cause us irreparable harm for which there is no adequate remedy at law, entitling us to injunctive and other relief. We may litigate to collect amounts due under this Agreement without first issuing a default or termination notice. If needed, our consent or approval may be withheld while you are in default under this Agreement or may be conditioned on the cure of all your defaults.

11.5    **Your Remedies.** If we fail to issue our approval or consent as and when required under this Agreement within a reasonable time of not less than 30 days after we receive all of the information we request, and you believe our refusal to approve or consent is wrongful, you may bring a legal action against us to compel us to issue our approval or consent to the obligation. To the extent permitted by applicable law, this action shall be your exclusive remedy. We shall not be responsible for direct, indirect, special, consequential or exemplary damages, including, but not limited to, lost profits or revenues.

12.    **Liquidated Damages.**

12.1    **Generally.** If we terminate the License or this Agreement under Section 11.2, or you terminate the License or this Agreement (except under Section 11.3 or as a result of our default which we do not cure within a reasonable time after written notice), you will pay us within 30 days following the date of termination, as Liquidated Damages, an amount equal to the sum of accrued Royalties and System Assessment Fees during the immediately preceding 36 full calendar months (or the number of months remaining in the unexpired Term (the "Ending Period") at the date of termination, whichever is less. If the Facility has been open for fewer than 36 months, then the amount shall be the average monthly Royalties and System Assessment Fees since the Opening Date multiplied by 36. You will also pay any applicable Taxes assessed on such payment and Interest calculated under Section 7.3 accruing from 30 days after the date of termination. Before the Ending Period, Liquidated Damages will not be less than the product of $2,000 multiplied by the number of guest rooms you are then authorized to operate under Schedule B of this Agreement, as amended. If we terminate this Agreement under Section 3 before the Opening Date, you will pay us within 10 days after you receive our notice of termination Liquidated Damages equal to one-half the amount payable for termination under Section 11.2. Liquidated Damages are paid in place of our claims for lost future Recurring Fees under this Agreement. Our right to receive other amounts due under this Agreement are not affected.

12.2    **Condemnation Payments.** If a Condemnation occurs, you will pay us the fees set forth in Section 7 for a period of one year after we receive the initial notice of condemnation described in Section 11.3.2 or until the Condemnation occurs, whichever is longer. If the Condemnation is completed before the one year notice period expires, you will pay us Liquidated Damages equal to the average daily Royalties and System Assessment Fees for the 12 month period preceding the date of your condemnation notice to us multiplied by the number of days remaining in the one year notice period. This payment will be made within 30 days after Condemnation is completed (when you close the Facility or you deliver it to the condemning authority). If the Condemnation is completed after the one year notice period expires you will pay no Liquidated Damages, but the fees set forth in Section 7 must be paid when due until Condemnation is completed.

14

12.3    **Exclusions.** The amount of System Assessment Fees used in the computation of Liquidated Damages shall exclude travel agent commissions, airline reservation system charges and related handling charges.

**13.    Your Duties At and After Termination.** When this Agreement terminates for any reason whatsoever:

13.1    **System Usage Ceases.** You will immediately stop using the System to operate and identify the Facility. You will remove all signage bearing any Marks and follow the other steps detailed in the System Standards Manual for changing the identification of the Facility. You will promptly paint over or remove distinctive System trade dress, color schemes and architectural features. You shall not identify the Facility with a confusingly similar mark or name, or use the same colors as the System trade dress for signage, printed materials and painted surfaces. You will cease all Internet marketing using any Marks to identify the Facility.

13.2    **Other Duties.** You will pay all amounts owed to us under this Agreement within 10 days after termination. You will owe us Recurring Fees on Gross Room Sales accruing while the Facility is identified as a "Super 8 Motel", including the System Assessment Fees for so long as the Facility receives service from the Reservation System. We may immediately remove the Facility from the Reservation System and divert reservations as authorized in Section 11.4. We may notify third parties that the Facility is no longer associated with the Chain. We may also, to the extent permitted by applicable law, and without prior notice enter the Facility, and any other parcels, remove software (including archive and back-up copies) for accessing the Reservation System, all copies of the System Standards Manual, Confidential Information, equipment and all other personal property of ours, and paint over or remove and purchase for $10.00, all or part of any interior or exterior Mark-bearing signage (or signage face plates), including billboards, whether or not located at the Facility, that you have not removed or obliterated within five days after termination. You will promptly pay or reimburse us for our cost of removing such items, net of the $10.00 purchase price for signage. We will exercise reasonable care in removing or painting over signage. We will have no obligation or liability to restore the Facility to its condition prior to removing the signage. We shall have the right, but not the obligation, to purchase some or all of the Facility's Mark-bearing FF&E and supplies at the lower of their cost or net book value, with the right to set off their aggregate purchase price against any sums then owed us by you.

13.3    **Advance Reservations.** The Facility will honor any advance reservations, including group bookings, made for the Facility prior to termination at the rates and on the terms established when the reservations are made and pay when due all related travel agent commissions.

13.4    **Survival of Certain Provisions.** Sections 3.8 (as to audits, for 2 years after termination), 3.13, 7 (as to amounts accruing through termination), 8, 11.4, 12, 13, 15, 16 and 17 survive termination of this Agreement, whether termination is initiated by you or us, even if termination is wrongful.

**14.    Your Representations and Warranties.** The parties disclaim making or relying upon any representation, promise, covenant, or warranty, express or implied, oral or written, except as expressly stated in this Agreement. You expressly represent and warrant to us as follows:

14.1    **Quiet Enjoyment and Financing.** You own, or will own prior to commencing improvement, or lease, the Location and the Facility. You will be entitled to possession of the

15



Location and the Facility during the entire Term without restrictions that would interfere with your performance under this Agreement, subject to the reasonable requirements of any financing secured by the Facility. You have, when you sign this Agreement, and will maintain during the Term, adequate financial liquidity and financial resources to perform your obligations under this Agreement.

14.2    **This Transaction.**  You and the persons signing this Agreement for you have full power and authority and have been duly authorized, to enter into and perform or cause performance of your obligations under this Agreement. You have obtained all necessary approvals of your owners, Board of Directors and lenders. No executory franchise, license or affiliation agreement for the Facility exists other than this Agreement.  Your execution, delivery and performance of this Agreement will not violate, create a default under or breach of any charter, bylaws, agreement or other contract, license, permit, indebtedness, certificate, order, decree or security instrument to which you or any of your principal owners is a party or is subject or to which the Facility is subject. Neither you nor the Facility is the subject of any current or pending merger, sale, dissolution, receivership, bankruptcy, foreclosure, reorganization, insolvency, or similar action or proceeding on the date you execute this Agreement and was not within the three years preceding such date, except as disclosed in the Application. You will submit to us the documents about the Facility, you, your owners and your finances that we request in the Franchise Application (or after our review of your initial submissions) before or within 30 days after you sign this Agreement.  To the best of your knowledge, neither you, your owners (if you are an entity), your officers, directors or employees or anyone else affiliated or associated with you, whether by common ownership, by contract, or otherwise, has been designated as, or is, a terrorist, a "Specially Designated National" or a "Blocked Person" under U.S. Executive Order 13224, in lists published by the U.S. Department of the Treasury's Office of Foreign Assets Control, or otherwise.

14.3    **No Misrepresentations or Implied Covenants.**  All written information you submit to us about the Facility, you, your owners, any guarantor, or the finances of any such person or entity, was or will be at the time delivered and when you sign this Agreement, true, accurate and complete, and such information contains no misrepresentation of a material fact, and does not omit any material fact necessary to make the information disclosed not misleading under the circumstances. There are no express or implied covenants or warranties, oral or written, between we and you except as expressly stated in this Agreement.

## 15.    <u>Proprietary Rights.</u>

15.1    **Marks and System.**  You will not acquire any interest in or right to use the System or Marks except under this Agreement. You will not apply for governmental registration of the Marks, or use the Marks or our corporate name in your legal name, but you may use a Mark for an assumed business or trade name filing.

15.2    **Inurements.**  All present and future distinguishing characteristics, improvements and additions to or associated with the System by us, you or others, and all present and future service marks, trademarks, copyrights, service mark and trademark registrations used and to be used as part of the System, and the associated good will, shall be our property and will inure to our benefit. No good will shall attach to any secondary designator that you use.

16

SUPEXCI
179957.2  Q2/05

15.3   **Other Locations and Systems.**  We and our affiliates each reserve the right to own, in whole or in part, and manage, operate, use, lease, finance, sublease, franchise, license (as licensor or licensee), provide services to or joint venture (i) distinctive separate lodging or food and beverage marks and other intellectual property which are not part of the System, and to enter into separate agreements with you or others (for separate charges) for use of any such other marks or proprietary rights, (ii) other lodging, food and beverage facilities, or businesses, under the System utilizing modified System Standards, and (iii) a Chain Facility at or for any location outside the Protected Territory.  You acknowledge that we are affiliated with or in the future may become affiliated with other lodging providers or franchise systems that operate under names or marks other than the Marks.   We and our affiliates may use or benefit from common hardware, software, communications equipment and services and administrative systems for reservations, franchise application procedures or committees, marketing and advertising programs, personnel, central purchasing, approved supplier lists, franchise sales personnel (or independent franchise sales representatives), etc.

15.4   **Confidential Information.**   You will take all appropriate actions to preserve the confidentiality of all Confidential Information.   Access to Confidential Information should be limited to persons who need the Confidential Information to perform their jobs and are subject to your general policy on maintaining confidentiality as a condition of employment or who have first signed a confidentiality agreement.   You will not permit copying of Confidential Information (including, as to computer software, any translation, decompiling, decoding, modification or other alteration of the source code of such software).  You will use Confidential Information only for the Facility and to perform under this Agreement.  Upon termination (or earlier, as we may request), you shall return to us all originals and copies of the System Standards Manual, policy statements and Confidential Information "fixed in any tangible medium of expression," within the meaning of the U.S. Copyright Act, as amended.  Your obligations under this subsection commence when you sign this Agreement and continue for trade secrets (including computer software we license to you) as long as they remain secret and for other Confidential Information, for as long as we continue to use the information in confidence, even if edited or revised, plus three years.  We will respond promptly and in good faith to your inquiry about continued protection of any Confidential Information.

15.5   **Litigation.**  You will promptly notify us of (i) any adverse or infringing uses of the Marks (or names or symbols confusingly similar), Confidential Information or other System intellectual property, and (ii) or any threatened or pending litigation related to the System against (or naming as a party) you or us of which you become aware.  We alone handle disputes with third parties concerning use of all or any part of the System.  You will cooperate with our efforts to resolve these disputes.  We need not initiate suit against imitators or infringers who do not have a material adverse impact on the Facility, or any other suit or proceeding to enforce or protect the System in a matter we do not believe to be material.

15.6   **The Internet.**  You may use the Internet to market the Facility subject to this Agreement and System Standards.   You shall not use, license or register any domain name, universal resource locator, or other means of identifying you or the Facility that uses a mark or any image or language confusingly similar to a Mark without our consent.  You will assign to us any such identification at our request without compensation or consideration.  You must make available through the Reservation System and the Chain website all rates you offer to the general public via Internet marketing arrangements with third parties.  You must participate in the Chain's best available rate on the Internet guarantee or successor program.  The content you provide us or use

17



yourself for any Internet marketing must be true, correct and accurate, and you will notify us in writing promptly when any correction to the content becomes necessary. You shall promptly modify at our request the content of any Internet marketing material for the Facility you use, authorize, display or provide to conform to System Standards. Any use of the Marks and other elements of the System on the Internet inures to our benefit under Section 15.2.

**16.    Relationship of Parties.**

16.1    **Independence.** You are an independent contractor. You are not our legal representative or agent, and you have no power to obligate us for any purpose whatsoever. We and you have a business relationship based entirely on and circumscribed by this Agreement. No partnership, joint venture, agency, fiduciary or employment relationship is intended or created by reason of this Agreement. You will exercise full and complete control over and have full responsibility for your contracts, daily operations, labor relations, employment practices and policies, including, but not limited to, the recruitment, selection, hiring, disciplining, firing, compensation, work rules and schedules of your employees.

16.2    **Joint Status.** If you comprise two or more persons or entities (notwithstanding any agreement, arrangement or understanding between or among such persons or entities) the rights, privileges and benefits of this Agreement may only be exercised and enjoyed jointly. The liabilities and responsibilities under this Agreement will be the joint and several obligations of all such persons or entities.

**17.  Legal Matters.**

17.1    **Partial Invalidity.** If all or any part of a provision of this Agreement violates the law of your state (if it applies), such provision or part will not be given effect. If all or any part of a provision of this Agreement is declared invalid or unenforceable, for any reason, or is not given effect by reason of the prior sentence, the remainder of the Agreement shall not be affected. However, if in our judgment the invalidity or ineffectiveness of such provision or part substantially impairs the value of this Agreement to us, then we may at any time terminate this Agreement by written notice to you without penalty or compensation owed by either party.

17.2    **Waivers, Modifications and Approvals.** If we allow you to deviate from this Agreement, we may insist on strict compliance at any time after written notice. Our silence or inaction will not be or establish a waiver, consent, course of dealing, implied modification or estoppel. All modifications, waivers, approvals and consents of or under this Agreement by us must be in writing and signed by our authorized representative to be effective. We may unilaterally revise Schedule C when this Agreement so permits.

17.3    **Notices.** Notices will be effective if in writing and delivered (i) by facsimile transmission with confirmation original sent by first class mail, postage prepaid, (ii) by delivery service, with proof of delivery, or (iii) by first class, prepaid certified or registered mail, return receipt requested, to the appropriate party (x) at its address stated below or as it may otherwise designate by notice, or (y) by such other means as to result in actual or constructive receipt by the person or office holder designated below. The parties may also communicate via electronic mail between addresses to be established by notice. You consent to receive electronic mail from us. Notices shall be deemed given on the date delivered or date of attempted delivery, if refused.

18

Super 8 Motels, Inc.:
Our address: 1 Sylvan Way, P.O. Box 278, Parsippany, New Jersey 07054-0278
Attention: Vice President-Franchise Administration;
Fax No. (973) 496-5360

Your name: Soham Investments LLC,
Your address: 1722 Mitchell Avenue, #105, Tustin, California 92780,
Attention: Pravin C. Kothari;
Your fax No.: (714) 573-0244.

17.4  **Remedies.**  Remedies specified in this Agreement are cumulative and do not exclude any remedies available at law or in equity. The non-prevailing party will pay all costs and expenses, including reasonable attorneys' fees, incurred by the prevailing party to enforce this Agreement or collect amounts owed under this Agreement.

17.5  **Miscellaneous.**  This Agreement is exclusively for the benefit of the parties. There are no third party beneficiaries. No agreement between us and anyone else is for your benefit. The section headings in this Agreement are for convenience of reference only.

17.6  **Choice of Law; Venue; Dispute Resolution.**

17.6.1  This Agreement will be governed by and construed under the laws of the State of New Jersey, except for its conflicts of law principles. The New Jersey Franchise Practices Act will not apply to any Facility located outside the State of New Jersey.

17.6.2  The parties shall attempt in good faith to resolve any dispute concerning this Agreement or the parties' relationship promptly through negotiation between authorized representatives. If these efforts are not successful, either party may attempt to resolve the dispute through non-binding mediation. Either party may request mediation through the National Franchise Mediation Program, using the procedures employed by the CPR Institute for Dispute Resolution, Inc. We will provide you with the contact address for that organization. The mediation will be conducted by a mutually acceptable and neutral third party. If the parties cannot resolve the dispute through negotiation or mediation, or choose not to negotiate or mediate, either party may pursue litigation.

17.6.3  You consent and waive your objection to the non-exclusive personal jurisdiction of and venue in the New Jersey state courts situated in Morris County, New Jersey and the United States District Court for the District of New Jersey for all cases and controversies under this Agreement or between we and you.

17.6.4  **WAIVER OF JURY TRIAL. THE PARTIES WAIVE THE RIGHT TO A JURY TRIAL IN ANY ACTION RELATED TO THIS AGREEMENT OR THE RELATIONSHIP BETWEEN THE FRANCHISOR, THE FRANCHISEE, ANY GUARANTOR, AND THEIR RESPECTIVE SUCCESSORS AND ASSIGNS.**

17.7  **Special Acknowledgments.  You acknowledge the following statements to be true and correct as of the date you sign this Agreement, and to be binding on you.**

17.7.1  **You received our Uniform Franchise Offering Circular ("UFOC") for prospective franchisees at least 10 business days before, and a copy of this Agreement and all other**

19



agreements we are asking you to sign at least 5 business days before, signing this Agreement and paying the Initial Fee to us.  You have received our UFOC at least 10 business days before you paid any fee to us or signed any contract with us.

17.7.2  Neither we nor any person acting on our behalf has made any oral or written representation or promise to you on which you are relying to enter into this Agreement that is not written in this Agreement.  You release any claim against us or our agents based on any oral or written representation or promise not stated in this Agreement.

17.7.3  This Agreement, together with the exhibits and schedules attached, is the entire agreement superseding all previous oral and written representations, agreements and understandings of the parties about the Facility and the License.

17.7.4  You acknowledge that no salesperson has made any promise or provided any information to you about projected sales, revenues, income, profits or expenses from the Facility except as stated in Item 19 of the UFOC or in a writing that is attached to this Agreement.

17.7.5  You understand that the franchise relationship is an arms' length, commercial business relationship in which each party acts in its own interest.

20

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first stated above.

**WE:**
**SUPER 8 MOTELS, INC.**

By: _____          Attest: _____
Richard M. Saltzman                                              Assistant Secretary
Vice President
Franchise Administration


**YOU**, as Franchisee:
**SOHAM INVESTMENTS LLC**

By: _____          Witness: _____
Print Name: ___ PRAVIN KOTHARI
Managing Member

SUPEXC1
179957.2  Q2/05

## APPENDIX A

### DEFINITIONS

Advertising and Reservation Fund or "the Fund" means The Super 8 Advertising and Reservation Fund into which System Assessment Fees are paid. The Fund is under our exclusive control, and shall be used by us for funding and administering, in our sole discretion, the reservation system, the training school, national and international directories, print and broadcast media advertising, technical and professional advice, consultation and services in connection with advertising, employment of personnel and office expenses for the administration of the Fund, advertising agency commissions, and other advertising or promotional programs we establish to promote the Chain.

Agreement means this Franchise Agreement.

Application Fee means the fee you pay when you submit your Application under Section 6.

Approved Plans means your plans and specifications for constructing or improving the Facility initially or after opening, as approved by us under Section 3.

Casualty means destruction or significant damage to the Facility by act of God or other event beyond your reasonable anticipation and control.

Chain means the network of Chain Facilities.

Chain Facility means a lodging facility we own, lease, manage, operate or authorize another party to operate using the System and identified by the Marks.

Condemnation means the taking of the Facility for public use by a government or public agency legally authorized to do so, permanently or temporarily, or the taking of such a substantial portion of the Facility that continued operation in accordance with the System Standards, or with adequate parking facilities, is commercially impractical, or if the Facility or a substantial portion is sold to the condemning authority in lieu of condemnation.

Conference Fee means the fee we charge for your attendance at a conference for Chain Facilities and their franchisees when and if held.

Confidential Information means any trade secrets we own or protect and other proprietary information not generally known to the lodging industry including confidential portions of the System Standards Manual or information we otherwise impart to you and your representatives in confidence. Confidential Information includes the "Rules of Operation Manual" and all other System Standards manuals and documentation, including those on the subjects of employee relations, finance and administration, field operation, purchasing and marketing, the Reservation System software and applications software.

Design Standards mean standards specified in the System Standards Manual from time to time for design, construction, renovation, modification and improvement of new or existing Chain Facilities, including all aspects of facility design, number of rooms, rooms mix and configuration, construction materials, workmanship, finishes, electrical, mechanical, structural, plumbing, HVAC, utilities, access, life safety, parking, systems, landscaping, amenities, interior design and decor and the like for a Chain Facility.

22



Directory means the general purpose directory we publish listing the names and addresses of Chain Facilities, and at our discretion, other Super 8 Motels and Super Suites facilities located outside the United States, Canada and Mexico.

Effective Date means that you first take possession of the Facility, even if you sign this Agreement after the date you first take possession of the Facility.

Equity Interests shall include, without limitation, all forms of equity ownership of you, including voting stock interests, partnership interests, limited liability company membership or ownership interests, joint and tenancy interests, the proprietorship interest, trust beneficiary interests and all options, warrants, and instruments convertible into such other equity interests.

Equity Transfer means any transaction in which your owners or you sell, assign, transfer, convey, pledge, or suffer or permit the transfer or assignment of, any percentage of your Equity Interests that will result in a change in control of you to persons other than those disclosed on Schedule B, as in effect prior to the transaction. Unless there are contractual modifications to your owners' rights, an Equity Transfer of a corporation or limited liability company occurs when either majority voting rights or beneficial ownership of more than 50% of the Equity Interests changes. An Equity Transfer of a partnership occurs when a newly admitted partner will be the managing, sole or controlling general partner, directly or indirectly through a change in control of the Equity Interests of an entity general partner. An Equity Transfer of a trust occurs when either a new trustee with sole investment power is substituted for an existing trustee, or a majority of the beneficiaries convey their beneficial interests to persons other than the beneficiaries existing on the Effective Date. An Equity Transfer does not occur when the Equity Interest ownership among the owners of Equity Interests on the Effective Date changes without the admission of new Equity Interest owners. An Equity Transfer occurs when you merge, consolidate or issue additional Equity Interests in a transaction which would have the effect of diluting the voting rights or beneficial ownership of your owners' combined Equity Interests in the surviving entity to less than a majority.

Facility means the Location, together with all improvements, buildings, common areas, structures, appurtenances, facilities, entry/exit rights, parking, amenities, FF&E and related rights, privileges and properties existing at the Location on the Effective Date or afterwards.

FF&E means furniture, fixtures and equipment.

FF&E Standards means standards specified in the System Standards Manual for FF&E and supplies to be utilized in a Chain Facility.

Food and Beverage means any restaurant, catering, bar/lounge, entertainment, room service, retail food or beverage operation, continental breakfast, food or beverage concessions and similar services offered at the Facility.

Gross Room Sales means gross revenues attributable to or payable for rentals of guest rooms at the Facility, including all credit transactions, whether or not collected, but excluding separate charges to guests for Food and Beverage, room service, telephone charges, key forfeitures and entertainment; vending machine receipts; and federal, state and local sales, occupancy and use taxes.

Improvement Obligation means your obligation to either (i) renovate and upgrade the Facility, or (ii) construct and complete the Facility, in accordance with the Approved Plans and System Standards, as described in Section 3.

23

 

Indemnitees means us, our direct and indirect parent, subsidiary and sister corporations, and the respective officers, directors, shareholders, employees, agents and contractors, and the successors, assigns, personal representatives, heirs and legatees of all such persons or entities.

Initial Fee means the fee you are to pay for signing this Agreement as stated in Section 6.

License means the non-exclusive license to operate the type of Chain Facility described in Schedule B only at the Location, using the System and the Mark we designate in Section 1.

License Year means:
   (i) *If the Opening Date occurs on the first day of a month:* the period beginning on the Opening Date and ending on the day immediately preceding the first anniversary of the Opening Date, and each subsequent one year period; or
   (ii) *If the Opening Date does not occur on the first day of a month:* the period beginning on the Opening Date and ending on the first anniversary of the last day of the month in which the Opening Date occurs, and each subsequent one year period.

Liquidated Damages means the amounts payable under Section 12, set by the parties because actual damages will be difficult or impossible to ascertain on the Effective Date and the amount is a reasonable pre-estimate of the damages that will be incurred and is not a penalty.

Location means the parcel of land situated at **1916 West 3rd Street, Winslow, Arizona 86047**, as more fully described in Schedule A.

Losses and Expenses means (x) all payments or obligations to make payments either (i) to or for third party claimants by any and all Indemnitees, including guest refunds, or (ii) incurred by any and all Indemnitees to investigate, respond to or defend a matter, including without limitation investigation and trial charges, costs and expenses, attorneys' fees, experts' fees, court costs, settlement amounts, judgments and costs of collection; and (y) the "Returned Check Fee" we then specify in the System Standards Manual ($20.00 on the Effective Date) if the drawee dishonors any check that you submit to us.

Maintenance Standards means the standards specified from time to time in the System Standards Manual for repair, refurbishment and replacement of FF&E, finishes, decor, and other capital items and design materials in Chain Facilities.

Marks means, collectively (i) the service marks associated with the System published in the System Standards Manual from time to time including, but not limited to, the name, design and logo for "Super 8 Motel" and other marks (U.S. Reg. Nos.: 992,721; 1,691,852; 1,686,653; 1,706,143; 1,602,723; 1,343,591, and 1,768,824) and (ii) trademarks, trade names, trade dress, logos and derivations, and associated good will and related intellectual property interests.

Marks Standards means standards specified in the System Standards Manual for interior and exterior Mark-bearing signage, advertising materials, china, linens, utensils, glassware, uniforms, stationery, supplies, and other items, and the use of such items at the Facility or elsewhere.

Minor Renovation means the repairs, refurbishing, repainting, and other redecorating of the interior, exterior, guest rooms, public areas and grounds of the Facility and replacements of FF&E we may require you to perform under Section 3.16.

24

<u>Minor Renovation Ceiling Amount</u> means $3,000.00 per guest room.

<u>Minor Renovation Notice</u> means the written notice from us to you specifying the Minor Renovation to be performed and the dates for commencement and completion given under Section 3.16.

<u>Opening Date</u> means the date as of which we authorize you to open the Facility for business identified by the Marks and using the System even if you sign this Agreement after that date. Unless we require that you close the Facility to perform any pre-opening Improvement Obligation, the Opening Date is the Effective Date.

<u>Operations Standards</u> means standards specified in the System Standards Manual for cleanliness, housekeeping, general maintenance, repairs, concession types, food and beverage service, vending machines, uniforms, staffing, employee training, guest services, guest comfort and other aspects of lodging operations.

<u>Permitted Transferee</u> means (i) any entity, natural person(s) or trust receiving from the personal representative of an owner any or all of the owner's Equity Interests upon the death of the owner, if no consideration is paid by the transferee or (ii) the spouse or adult issue of the transferor, if the Equity Interest transfer is accomplished without consideration or payment, or (iii) any natural person or trust receiving an Equity Interest if the transfer is from a guardian or conservator appointed for an incapacitated or incompetent transferor.

<u>Protected Territory</u> means **the area within a three (3) mile radius whose center point is the front door of the Facility**.

<u>Punch List</u> means the list of upgrades and improvements attached as part of Schedule B, which you are required to complete under Section 3.

<u>Recurring Fees</u> means fees paid to us on a periodic basis, including without limitation, Royalties, System Assessment Fees, and other reservation fees and charges as stated in Section 7.

<u>Relicense Fee</u> means the fee you are to pay for signing this Agreement as stated in Section 6. It also refers to the fee your transferee or you pay to us under Section 7 when a Transfer occurs.

<u>Reservation System</u> or "Central Reservation System" means the system for offering to interested parties, booking and communicating guest room reservations for Chain Facilities described in Section 4.2.

<u>Rooms Addition Fee</u> means the fee we charge you for adding guest rooms to the Facility.

<u>Royalty</u> means the monthly fee you pay to us for use of the System under Section 7.1.1. "Royalties" means the aggregate of all amounts owed as a Royalty.

<u>Service Interruption Fee</u> means the fee you pay us when we suspend Central Reservation System service because you default under this Agreement, in the amount specified in Schedule C.

<u>System</u> means the comprehensive system for providing guest lodging facility services under the Marks as we specify which at present includes only the following: (a) the Marks; (b) other

25



intellectual property, including Confidential Information, System Standards Manual and know-how; (c) marketing, advertising, publicity and other promotional materials and programs; (d) System Standards; (e) training programs and materials; (f) quality assurance inspection and scoring programs; and (g) the Reservation System.

System Assessment Fee means the aggregate of all fees charged under Section 7.1.2 to pay for the cost of the System's marketing, advertising, Reservation System, training and other services.

System Standards means the standards for the participating in the System published in the System Standards Manual, including but not limited to Design Standards, FF&E Standards, Marks Standards, Operations Standards, Technology Standards and Maintenance Standards and any other standards, policies, rules and procedures we promulgate about System operation and usage.

System Standards Manual means the Rules of Operations Manual, the Trademark Identification Standards Manual and any other manual we publish or distribute specifying the System Standards.

Taxes means the amounts payable under Section 7.2 of this Agreement.

Technology Standards means standards specified in the System Standards Manual for local and long distance telephone communications services, telephone, telecopy and other communications systems, point of sale terminals and computer hardware and software for various applications, including, but not limited to, front desk, rooms management, records maintenance, marketing data, accounting, budgeting and interfaces with the Reservation System to be maintained at the Chain Facilities.

Term means the period of time during which this Agreement shall be in effect, as stated in Section 5.

Termination means a termination of the License under Sections 11.1 or 11.2 or your termination of the License or this Agreement.

Transfer means (1) an Equity Transfer, (2) you assign, pledge, transfer, delegate or grant a security interest in all or any of your rights, benefits and obligations under this Agreement, as security or otherwise without our consent as specified in Section 9, (3) you assign (other than as collateral security for financing the Facility) your leasehold interest in (if any), lease or sublease all or any part of the Facility to any third party, (4) you engage in the sale, conveyance, transfer, or donation of your right, title and interest in and to the Facility, (5) your lender or secured party forecloses on or takes possession of your interest in the Facility, directly or indirectly, or (6) a receiver or trustee is appointed for the Facility or your assets, including the Facility. A Transfer does not occur when you pledge or encumber the Facility to finance its acquisition or improvement, you refinance it, or you engage in a Permitted Transferee transaction.

"You" and "Your" means and refers to the party named as franchisee identified in the first paragraph of this Agreement and its Permitted Transferees.

"We", "Our" and "Us" means and refers to Super 8 Motels, Inc., a South Dakota corporation, its successors and assigns.

SUPEXC1
179957.2 Q2/05

## **SCHEDULE A**

(Legal Description of Facility)

27

EXHIBIT "A"

LEGAL DESCRIPTION

PARCEL NO. 1

The East half of Lot 29 and all of Lot 30, of KACHINA VISTA NO. 2, according to the plat of record in the office of the County Recorder of Navajo County, Arizona, recorded in Book 5 of Plats, Page 43;

EXCEPT all minerals as reserved in instrument recorded in Book 18 of Deeds, Page 453.

PARCEL NO. 2

BEGINNING at a point on the Section line between Section 23 and 24, Township 19 North, Range 15 East of the Gila and Salt River Base and Meridian, Navajo County, Arizona, 489.47 feet Northerly from the quarter corner between said Sections;

THENCE turn at an angle of 90 degrees to the left, a distance of 303.40 feet to the intersection of the Arizona State Highway right-of-way fence;

THENCE turn at an angle of 45 degrees to the right, a distance of 50 feet along said right-of-way fence;

THENCE turn at an angle of 00 degrees 18 minutes to the left along said fence, a distance of 100 feet;

THENCE turn at an angle of 00 degrees 35 minutes to the left along said fence a distance of 50 feet to the TRUE POINT OF BEGINNING;

THENCE turn at an angle of 00 degrees 32 minutes to the left along said fence, a distance of 50 feet;

THENCE turn at an angle of 00 degrees 25 minutes to the left, a distance of 50 feet;

THENCE turn at an angle of 89 degrees 43 minutes to the right, a distance of 300 feet;

THENCE turn at an angle of 91 degrees 14 minutes to the right, a distance of 162.20 feet;

THENCE turn at an angle of 91 degrees 39 minutes to the right, a distance of 162.20 feet;

THENCE turn at an angle of 91 degrees 39 minutes to the right, a distance of 298.45 feet to the TRUE POINT OF BEGINNING;

EXCEPT all minerals as reserved in instrument recorded in Book 18 of Deeds, Page 452.

## SCHEDULE B

PART I:        YOUR OWNERS:

| Name | Ownership Percentage | Type of Equity Interest | Office Held (Title) |
|------|---------------------|------------------------|---------------------|
| Pravin C. Kothari | 50.0% | Member | |
| Hitesh Chokshi | 50.0% | Member | |

PART II:        THE FACILITY:

Primary designation of Facility: Super 8 Motel

Number of approved guest rooms: **46**.

Parking facilities (number of spaces, description): **46**.

Other amenities and facilities:

PART III:        DESCRIPTION AND SCHEDULE OF RENOVATIONS TO BE
COMPLETED AS THE IMPROVEMENT OBLIGATION:

**[Punch List to be attached.]**

_____
Initial

SUPEXCI
179957.2  Q2/05



## FRANCHISOR: SUPER 8 MOTELS, INC.

### "SCHEDULE B PART III"
### PUNCHLIST FOR CHANGE OF OWNERSHIP
### JUNE 1, 2004
### (Revised on May 24, 2005)

| FACILITY | TIER | GUESTROOMS |
|---|---|---|
| Super 8 Motel #3118 | Motel | 46 |
| 1916 W. 3rd Street | | |
| Winslow, AZ | | |

**FRANCHISE RETENTION**

**OWNER/APPLICANT**
Pravin C. Kothari
(714) 573-0244

Kevin Paterson
(949) 367-2463

| | **STANDARD** |
|---|---|
| Lobby Dimensions: | 220 SF |
| Guestroom Dimensions: | 288 SF |

## COMPLETION TIME

All items listed in this punchlist must be completed within the noted time frames.

**This Punchlist may contain approved time extensions granted for the purpose of completing specific upgrades or projects required for compliance with the Rules of Operation and Design Manual for Super 8 Motels, Inc. Failure to comply with time extension deadlines may result in immediate reservation restriction and default under your franchise agreement.**

6/18/2005
( PRAVIN KOTHARI )
FOR SOHAM INVESTMENTS LLC
MY Ptr.

2

Super 8 Motel #3118
Winslow, AZ

*All Super 8 Motels are required to be in compliance with all items outlined in the Rules of Operation and Design Manual. Following is a partial, but by no means complete, listing. Immediate compliance is required unless otherwise noted within the body of the punchlist.*

- All new General Managers are required to complete management training. It is strongly recommended that this take place prior to opening as a Super 8 Motel, but in no event may it be postponed any longer than 90 days after the opening date.
- All first time Super 8 Motel franchisees are required to attend an orientation program.
- Super 8 Motel exterior signage per Company specifications.
- Dumpster enclosure to conceal from guests' view is required.
- Landscape upgrades that are professionally designed and executed and approved in advance by the franchisor.
- A SUPER 8 MOTEL showcase in lobby area
- Each Super 8 Motel is required to provide at a minimum, a complimentary continental breakfast per Company specifications.
- A portable phone at the front desk for manager's use.
- A gas detection system must be installed in each area where gas appliances exist in the property.
- Facilities to assist the handicapped in accordance with Local, State and Federal codes, regulations and ordinances.
- Stairwell(s) and corridor(s) must be equipped with emergency and exit lighting with a backup power source.
- Super 8 Motels, Inc. does not allow restaurant or lounge facilities. Restaurant/lounge space must be renovated for alternative use.
- A Company approved Property Management System (PMS) is required.
- Electronic locks meeting Company specifications are to be installed all guestroom entrance doors.
- Hardwired smoke detectors with a backup system are required. This system may be a battery within the unit or a generator system that is capable of restoring electrical service in case of an outage.
- A safety guard lock (loop bar or chain) or other non-keyed locking device is required.
- Install a self-closing device on all interior guestroom entrance doors.
- A one-way viewer in all guestroom entrance doors.
- A one way, doorknob latch set and a separate, non-keyed, 1" deadbolt lock on all connecting room doors. Operating knobs must be located on room side only with flush plates on inside of doors.
- A minimum of one glass front, framed picture per headboard, two in a King bedded room is required. Minimum size required is 20" x 16".
- Minimum 25", remote control televisions are required.
- A solid wood or upholstered (vinyl not acceptable) luggage bench or wood or metal folding luggage rack is required.

3

Super 8 Motel #3118
Winslow, AZ

> *All Super 8 Motels are required to be in compliance with all items outlined in the Rules of Operation and Design Manual. Following is a partial, but by no means complete, listing. Immediate compliance is required unless otherwise noted within the body of the punchlist. Continued*

- A GFCI (Ground Fault Circuit Interrupter) outlet in vanity areas.
- A minimum of 60% of guestrooms must be prepared and designated as non-smoking rooms.
- Company requires that all properties maintain housekeeping at the highest levels.

> *In addition, the following renovations are required for this site.*

> *TO BE COMPLETED WITHIN 30 DAYS OF THE NEW LICENSE AGREEMENT*

## PROPERTY EXTERIOR:

Upgrade landscaping to enhance curb appeal by installing items such as landscape islands that may include trees, shrubs, flowers and ground cover. Additional landscape beds should be installed concentrating on the perimeter areas. Eliminate weeds and overgrowth in rear of building. The use of a professional landscaping firm is required. For additional assistance, contact the Design and Development Department at (973) 496-2525 for assistance.

## PUBLIC AREAS:

At time of inspection, there was a spider found in room #121. All necessary measures are needed to eliminate all insects from the guestrooms.

8/8/2005

4

Super 8 Motel #3118
Winslow, AZ

---

## *TO BE COMPLETED WITHIN 30 DAYS OF THE NEW LICENSE AGREEMENT CONTINUED*

---

## *COMPLIMENTARY CONTINENTAL BREAKFAST*

1. Each Super 8 Motel is required to provide at a minimum, a complimentary continental breakfast per Company specifications. An upgraded complimentary continental breakfast option is also permitted and must meet the minimum upgrade specifications established by the Company. The property's directory listing must accurately reflect the breakfast option offered to guests.

2. This area is required to be furnished with all necessary F F & E (i.e. fabric upholstered seating, counter space, enclosed trash receptacles, etc.) deemed necessary by the Brand and the Design and Development Department. Contact the Design and Development Department at (973) 496-2525 for assistance.

## *GUESTROOMS:*

Repair out of adjustment self closures to properly close as in rooms #240, #109 and #121.

## *OPERATIONAL REQUIREMENTS:*

1. Company requires that all properties maintain housekeeping at the highest levels.

2. Ensure property is in compliance with all items outlined in the Rules of Operation and Design Manual for Super 8 Motels, Inc. to include but not be limited to current market collateral, staff uniforms, guest convenience and amenity items, guestroom amenities and supplies and so on.

5

Super 8 Motel #3118
Winslow, AZ

---

**TO BE COMPLETED WITHIN 120 DAYS OF THE NEW LICENSE
AGREEMENT**

---

## PUBLIC AREAS:

Remove guestroom style credenza in continental breakfast seating area.  Commercial
style furniture is required.  The use of guestroom furniture in public areas is not
acceptable.

---

**TO BE COMPLETED WITHIN 120 DAYS OF THE NEW LICENSE
AGREEMENT**

---

## GUESTROOMS:

Upgrade guestrooms and bath area to include:
a.   Replace carpet where worn or stained as in room #248.  Company requires
      minimum 26 ounce cut pile carpet with padding Carpet must also be wall to wall.
b.   Replace activity table chairs where stained as in room #240.  Two chairs
      (minimum one with arms) per room are required. Chairs must be fabric covered.
      Ensure new chairs match existing casegoods.
c.   Replace mismatched floor lamps.  Provide one lamp per headboard and lighting in
      the work area, leisure area and credenza area.  All wall-mounted lamps must have
      wire covers or molding, loose cords are not acceptable.  Lamp package must be
      neutral and contemporary (i.e. brass). The use of red or other colors of anodized
      metal is not recommended.  Swag lamps are not acceptable.
d.   Replace linen to include sheets, pillows, pillow cases, blankets and mattress pads
      at have holes.
e.   Replace flat pillows.  The use of two pillows in one pillowcase as in room #240 is
      not acceptable.
f.   Replace bedsets (mattress and boxsprings) to eliminate all that are stained, sagging
      or have loss of support.
g.   Repair and paint bath walls where patched or peeling as in rooms #109 and #114.
      Company requires either 12 ounce vinyl wallcovering or an approved textured
      finish. Replace tub/shower surrounds.
h.   Replace plumbing fixtures/trim (sinks or tubs) where tarnished or corroded (faucets,
      drains rings, etc.).
i.   Replace toilet seats where discolored or stained as in room #109.  A toilet seat/lid
      combination is required.

6

Super 8 Motel #3118
Winslow, AZ

HANDWRITTEN OR UNAUTHORIZED REVISIONS TO THIS PUNCHLIST ARE NOT
VALID AND DO NOT BIND THE FRANCHISOR.  ANY AND ALL REVISIONS TO THIS
PUNCHLIST MUST BE MADE AND APPROVED BY THE FRANCHISOR'S QUALITY
ASSURANCE DEPARTMENT.

This Punchlist identifies items that require action due to meet the Franchisor's standards.  The
Franchisor does not warrant that completion of the items on this Punchlist will cause the
converting facility to be in compliance with any applicable federal, state, local codes, ordinances
or regulations.  You (and your architect, contractor and engineer, if applicable) are solely
responsible for conforming the Facility to the requirements of federal, state and local codes,
ordinances and regulations that may apply to your site.

This Punchlist has been prepared on the basis of a random sample inspection of the Facility on
the date specified.  The owner is responsible for meeting all Franchisor Standards.  All repairs,
replacements and improvements must cause the item to meet or exceed the Franchisor's standards
published in the Standards of Operation and Design Manual.

This Punchlist will be subject to revision at the discretion of the Franchisor if the condition of the
facility changes materially or the License (Franchise) Agreement to which this is attached is
executed more than 90 days after the date of the Punchlist.  Note that ordinary wear and tear,
particularly during busy seasons, may result in the need for additional work to meet entry
standards of the Franchisor.

**This Punchlist is subject to revision by the Franchise Review Committee and should not be
considered to be final until the License Agreement for the inspected facility is executed by
the Company.**

**NOTE:**  Any item on this Punchlist that is not required to be completed prior to the new license
agreement will continue to be evaluated for appearance and condition during all Quality
Assurance inspections conducted before the date when completion is required.

**This Punchlist was revised on May 24, 2005.  All previous copies are invalid.**
1.  revised on 10/13/04 name change          2.  revised on 05/24/05 name change

03118 CO S8
dg/dg/dg

## SUPER 8 MOTELS, INC.
## SCHEDULE C
### April 2005

### System Assessment Fee

The System Assessment Fee is equal to three percent (3%) of Gross Room Sales, and is paid into the Advertising and Reservation Fund. The System Assessment Fee is a recurring, non-refundable payment. All or any part of Fund proceeds received during an accounting period need not be disbursed within that accounting period. Notwithstanding the above, we may increase the System Assessment Fee you pay upon 60 days advance written notice, effective at any time on or after the tenth (10th) anniversary of the Effective Date of this Agreement, as part of a Chain-wide increase in System Assessment Fees we implement in our sole discretion to cover costs (including reasonable direct or indirect overhead costs) related to such services and programs. We may increase System Assessment Fees on a Chain-wide basis before the tenth anniversary of the Effective Date but such Fees will not begin to accrue at the increased rate until the tenth anniversary of the Effective Date.

### Additional Fees

A.    Mandatory Marketing Program Charge

We charge a Mandatory Marketing Program Charge for your participation in the TripRewards® or successor guest loyalty program. Under TripRewards, program members staying at qualifying rates at Chain Facilities earn their choice of TripRewards points, airline miles or other program currency. TripRewards points are redeemable for free stays at Chain Facilities and for travel, merchandise, entertainment and other awards. The Mandatory Marketing Program Charge is up to 5% of the Gross Room Sales accruing from each qualifying stay at the Facility. We will proactively match and award members with points or other program currency they earn on qualified stays even if they do not present their TripRewards membership card upon check–in. You will be billed monthly in arrears for qualifying stays by program members during the preceding month.

B.    GDS and Internet Booking Fees

We will charge you under our Central Commission Payment Program either a GDS Fee or an Internet Booking Fee for reservations processed through the global distribution systems ("GDS"), including any operated by an affiliate, or the Internet for your Facility. The GDS Fee described in Section 7 is $4.50 per reservation processed through any GDS or through any Internet website powered by a GDS. Internet-originated reservations carry fees of $3.50 per reservation booked through sources other than GDS powered websites or our Chain website. GDS and Internet-originated reservations may also carry a commission if the originator qualifies. If a guest cancels a GDS or Internet-originated reservation using the same source as was used to originate the reservation, you will not be charged the applicable fee.

C.    Other Reservation System Charges

Agency and other commissions are typically 10% of the Gross Room Sales generated by each reservation booked by an agency or other qualifying originator, plus our service charge of



.75% of commissionable revenue. Agencies which are part of a travel consortium or a travel management company, including our affiliates, may charge additional commissions of up to 5% and/or participation fees to be included in their programs. We may raise the agent commission to up to 15% of Gross Room Sales from time to time for certain Chain-wide promotions, plus our service charge of .75% of commissionable revenue, upon 30 days advance written notice. Such increases will apply only to reservations booked after we announce the increased commission unless we specify otherwise. The general sales agent commission (also known as the international sales office commission) is 15% of the Gross Room Revenues generated by each reservation originated in an area served by a general sales agent/international sales office and includes the agency commission.

By accepting reservations from the GDS, Internet, travel agencies and other intermediaries, you agree to participate in our Central Commission Payment Program and to reimburse us for any fees or commissions we pay to intermediaries and retailers on your behalf. You may elect not to receive reservations from either the GDS or Internet websites, other than the Chain's website, by giving us 60 days advance written notice. We will remove the Facility from participation in both channels. However, you must pay all fees and commissions incurred for reservations booked through the GDS or Internet before deactivation. You may reactivate the Facility's listing through such channels once by paying us a reactivation charge of $100.00, after which you may not deactivate again during the Term of your License. Your participation in the GDS and Internet must be for either both or neither distribution channel.

We also charge you an annual website maintenance fee of $36.00 to maintain the Facility's web pages on the Chain's website. We may charge additional fees for creating or modifying the Facility's web pages or performing other services related to Internet marketing.

If we suspend Central Reservation System service because of your default under this Agreement, then you must pay us a Service Interruption Fee of $200 before we restore service.

You must (i) make available through the Central Reservation System and the Chain website room rates equivalent to those offered to the general public by third parties that you authorize to offer and sell reservations for the Facility's guest rooms and (ii) participate in the Chain's Best Available Rate Guarantee Program according to its published requirements. Beginning May 1, 2004 if a guest finds a lower publicly available rate on the Internet than the "Best Available Rate" you offer through the Chain website or the Central Reservation System for the same date and accommodations and the guest meets all Program requirements, you must provide the first room night to the guest without a room charge. You may collect standard incidental fees, charges and taxes. We will also charge you a Processing Fee of $25 to reimburse us for our administrative charges of handling the complaint.

We will offer you the opportunity to participate in certain Internet distribution channel marketing and reservation activity with third parties including our affiliates. Under one type of arrangement, you will offer rooms for sale through an electronic distribution channel on which you will be paid a net, non-commissionable rate if and when the rooms are sold by the distribution channel at its marked-up rate. For providing and managing this activity we may receive commissions from the Internet distribution channels based upon the mark-up or room rates that they receive for renting your rooms. The net rate you receive, not the mark-up retained by the channel, should be included in Gross Room Revenues. We will allocate these commissions to Royalties and System Assessment Fees in equal proportions. Under another type

30

 

of arrangement, you will offer rooms for sale through an electronic distribution channel at your best commissionable rate. The distribution channel will not mark-up these rates but will charge you a commission of up to 15% on consumed room nights.

We or an affiliate may charge you a sales agent commission of up to 10% of the Gross Room Revenues generated from consumed reservations booked by members of certain affinity groups and organizations at your Facility if you participate in our Member Benefits sales program. We or our affiliate usually pays a portion of this commission to the affinity group or organization in exchange for promoting the Member Benefits program to its members.

D.    Guest Services Assessment

We will contact you if we receive any guest complaint about you or the Facility, and you will be responsible for resolving the complaint to the satisfaction of the guest. If you do not respond to any complaint within 7 business days after we refer it to you and the guest contacts us again to seek resolution, we will charge you a "Guest Services Assessment" of $75.00, plus the costs we incur to settle the matter with the guest. In addition, if the number of guest complaints per 1,000 occupied roomnights about you or the Facility in a calendar year exceed the "Annual Facility Allotment" we establish, we will charge you a "Processing Fee" of $25.00 for each additional complaint we receive during that year, regardless of whether you are able to resolve it to the guest's satisfaction. We may change or eliminate the Guest Services Assessment, the Processing Fee, the Annual Facility Allotment and/or the time for responding to or resolving a guest complaint on a Chain-wide basis at any time upon 30 days advance notice. The Guest Services Assessment and the Processing Fee are intended only to reimburse us for the costs of complaint handling and are not intended as penalties or liquidated damages. All guest complaints remain subject to indemnification under this Agreement.

We may increase or adjust any of the Additional Fees to cover increases in their allocated costs and may add new fees and charges for new services and programs at any time upon not less than 60 days notice.

31

# EXHIBIT B



SUPER 8 MOTELS, INC.

Franchise Administration

January 17, 2006

Soham Investments LLC
1916 West 3rd Street
Winslow, AZ 86047

RE:    WINSLOW, AZ – SUPER 8 – SITE # 3118 - **LETTER AMENDMENT**

Dear Mr. Kothari:

This letter is to amend the date of execution of the Franchise Agreement for the Super 8 Motel located at 1916 West 3rd. Street, Winslow, Arizona, site # 3118. The Agreement was dated and returned to you with a date of May 26, 2005, this letter shall serve to amend the date to June 16, 2005.

Please sign below as confirmation of acknowledgement and acceptance to the above terms and conditions.

Sincerely,

Jeanine Mahan
Manager of Relicensing

The terms and conditions of this letter are hereby agreed to and accepted by the Licensee effective as of June 16, 2006.

By: _____

Title: _____

ʌ

# EXHIBIT C



## GUARANTY

To induce Super 8 Motels, Inc., its successors and assigns ("you") to sign the Franchise Agreement (the "Agreement") with the party named as the "Franchisee," to which this Guaranty is attached, the undersigned, jointly and severally ("we, "our" or "us"), irrevocably and unconditionally (i) warrant to you that Franchisee's representations and warranties in the Agreement are true and correct as stated, and (ii) guaranty that Franchisee's obligations under the Agreement, including any amendments, will be punctually paid and performed.

Upon default by Franchisee and notice from you we will immediately make each payment and perform or cause Franchisee to perform, each unpaid or unperformed obligation of Franchisee under the Agreement. Without affecting our obligations under this Guaranty, you may without notice to us extend, modify or release any indebtedness or obligation of Franchisee, or settle, adjust or compromise any claims against Franchisee. We waive notice of amendment of the Agreement. We acknowledge that Section 17 of the Agreement, including Remedies, Venue and Dispute Resolution, and WAIVER OF JURY TRIAL, applies to this Guaranty.

Upon the death of an individual guarantor, the estate of the guarantor will be bound by this Guaranty for obligations of Franchisee to you existing at the time of death, and the obligations of all other guarantors will continue in full force and effect.

This Guaranty may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one in the same instrument.

IN WITNESS WHEREOF, each of us has signed this Guaranty effective as of the date of the Agreement.

**WITNESSES:**                                      **GUARANTORS:**

_____                 _____
                                                              Pravin C. Kothari

_____                 _____
                                                              Hitesh Chokshi

SUPEXC1
179957.2  Q2/05

# EXHIBIT D

# WYNDHAM

HOTEL GROUP
Compliance Department
22 Sylvan Way
Parsippany, New Jersey 07054
Ph (973) 753-6000 ● fax (800) 880-9445
www.wyndhamworldwide.com

May 3, 2012

**VIA 2 DAY DELIVERY METHOD**

Mr. Pravin Kothari
Soham Investments, LLC
1916 West 3rd St.
Winslow, AZ 86047

Re:    **NOTICE OF TERMINATION** of License for Super 8® System Unit #03118-80713-04 located in Winslow, AZ ("Facility")

Dear Mr. Kothari:

Super 8 Worldwide, Inc., successor in interest to Super 8 Motels, Inc. ("we," "our" or "us") received a Warranty Deed advising us that Soham Investments, LLC ("you" or "your") transferred possession of the Facility on January 19, 2012 (the "Termination Date") causing the termination of the Franchise Agreement dated June 16, 2005, as amended (the "Agreement"). Accordingly, your license to operate the Facility in the Super 8 System terminated on the Termination Date.

We regret that the Facility will no longer operate as a Super 8 facility and must now require you to fulfill the post-termination obligations set forth in the Agreement, including the payment of Liquidated Damages.

As a result of the premature termination of the Agreement, you are required to pay us Liquidated Damages in the amount of $92,000.00 as provided in Section 12.1 of the Agreement. You must also pay Damages of $3,516.00 for termination of the Addendum to the Agreement for Satellite Connectivity Services (the "Addendum"), plus any additional fees and charges as per Schedule 3 of the Addendum. The Addendum has also terminated on the Termination Date. In addition, you apparently failed to de-identify the Facility before relinquishing control of the Facility. If we must file suit to force de-identification of the Facility, we reserve the right to include a claim in that action against you for contributory infringement and dilution under the applicable federal trademark statutes. Please consider this letter to be a notice and demand for payment under any Guaranty of the Agreement, directed to all of your Guarantors.

# WYNDHAM

HOTEL GROUP

       

       

Mr. Pravin Kothari
May 3, 2012
Page Two

We hope, of course, to resolve this matter amicably.  If you have any questions concerning the contents of this letter, please feel free to contact Charlene Martin, Senior Manager of Settlements, at (973) 753-7602.

Sincerely,

Valerie Capers Workman
Vice President
Compliance & Government Relations

Enclosure

cc:    Hitesh T. Chokshi (Guarantor)
       John Valletta
       Larry Geer
       Charlene Martin

Report Date : 12-APR-12

ITEMIZED STATEMENT
-----------------

As of Date (DD-MMM-YYYY) : 19-JAN-2012
Customer No                : 03118-80713-04-SUP
Category Set               :
Category Group             :
Group No                   :
Bankruptcy                 : Only Bankruptcy Sites
Disputed                   : No
Finance Charges Included:  Yes

Page 1 of 2

Report Date : 12-APR-12

ITEMIZED STATEMENT
-------------------

******* NO DATA FOUND *******

Requested By: Indardaye Christian

Page 2 of 2

 **Shipment Receipt**

---

**Transaction Date:** 03 May 2012     **Tracking Number:**     1Z208E370299283214

| **1** | **Address Information** |
|---|---|

| **Ship To:** | **Ship From:** | **Return Address:** |
|---|---|---|
| Soham Investments, LLC | Wyndham Worldwide - 22 Sylvan | Wyndham Worldwide - 22 Sylvan |
| Pravin Kothari | Kanyelle Barrino | Kanyelle Barrino |
| 1916 West 3rd St. | 22 Sylvan Way | 22 Sylvan Way |
| WINSLOW AZ 860472112 | Parsippany NJ 07054 | Parsippany NJ 07054 |
| | Telephone:973-753-7787 | Telephone:973-753-7787 |

| **2** | **Package Information** |
|---|---|

| Weight | Dimensions / Packaging | Declared Value | Reference Numbers |
|---|---|---|---|
| 1.   Letter | UPS Letter | | Reference # 1 - 006-1696 |

| **3** | **UPS Shipping Service and Shipping Options** |
|---|---|

| **Service:** | UPS 2nd Day Air |
|---|---|
| **Guaranteed By:** | End of Day Monday, May 7, |
| 2012 | |
| **Shipping Fees Subtotal:** | **22.52 USD** |
| Transportation | 17.75 USD |
| Fuel Surcharge | 2.77 USD |
| **Delivery Area Surcharge- Extended** | |
| Package 1 | 2.00 USD |

| **4** | **Payment Information** |
|---|---|

| **Bill Shipping Charges to:** | Shipper's Account 208E37 |
|---|---|

A discount has been applied to the Daily rates for this shipment

| **Total Charged:** | **22.52 USD** |
|---|---|
| **Negotiated Total:** | **7.87 USD** |

**Note: Your invoice may vary from the displayed reference rates.**
\* For delivery and guarantee information, see the UPS Service Guide. To speak to a customer service representative, call 1-800-PICK-UPS for domestic services and 1-800-782-7892 for international services.

UPS CampusShip: Shipment Receipt

Page 1 of 1



**Shipment Receipt**

*COPY address (secondary) address*

Transaction Date: 03 May 2012                    Tracking Number:        1Z208E370296430220

**1  Address Information**

| Ship To: | Ship From: | Return Address: |
|---|---|---|
| Soham Investments, LLC | Wyndham Worldwide - 22 Sylvan | Wyndham Worldwide - 22 Sylvan |
| Pravin Kothari | Kanyelle Barrino | Kanyelle Barrino |
| 1722 Mitchell Ave., #105 | 22 Sylvan Way | 22 Sylvan Way |
| TUSTIN CA 927806376 | Parsippany NJ 07054 | Parsippany NJ 07054 |
| Residential | Telephone:973-753-7787 | Telephone:973-753-7787 |

**2  Package Information**

| Weight | Dimensions / Packaging | Declared Value | Reference Numbers |
|---|---|---|---|
| 1.  Letter | UPS Letter | | Reference # 1 - 006-1696 |

**3  UPS Shipping Service and Shipping Options**

| | |
|---|---|
| Service: | UPS 2nd Day Air |
| Guaranteed By: | End of Day Monday, May 7, 2012 |
| Shipping Fees Subtotal: | 23.66 USD |
| Transportation | 17.75 USD |
| Fuel Surcharge | 2.91 USD |
| Residential Surcharge | 3.00 USD |

**4  Payment Information**

Bill Shipping Charges to:                    Shipper's Account 208E37

A discount has been applied to the Daily rates for this shipment

| | |
|---|---|
| Total Charged: | 23.66 USD |
| Negotiated Total: | 7.28 USD |

**Note: Your invoice may vary from the displayed reference rates.**
* For delivery and guarantee information, see the UPS Service Guide. To speak to a customer service representative, call 1-800-PICK-UPS for domestic services and 1-800-782-7892 for international services.